# United States Court of Appeals
## For the First Circuit

No. 02-1495

MURPHY A. LEWIS,

Plaintiff, Appellant,

v.

CITY OF BOSTON,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lipez, Circuit Judge,
Coffin and Stahl, Senior Circuit Judges.

Ozell Hudson, Jr., with whom Anthony W. Neal, was on brief, for appellant.
James M. Chernetsky, Assistant Corporation Counsel, for appellee.

January 28, 2003

**STAHL**, <u>Senior Circuit Judge</u>.  Plaintiff-appellant Murphy A. Lewis ("Lewis") brought this action against the City of Boston ("City"), claiming that the City first discharged him and then failed to hire him for a newly created position because of his race in violation of Mass. Gen. Laws ch. 151B, § 4(1) and because of his public statements regarding inadequate funding for the City's music programs in violation of the First Amendment.  The district court granted summary judgment in the City's favor.  We affirm.

**I**

Lewis, an African-American male, has been employed by the City in the Boston Public Schools ("BPS") from 1975 through the present, and served as city-wide Music Director from 1995 through August 1999.  The City initially employed Lewis as a music instructor from 1975 to August 18, 1995, at which time the City appointed him as acting Music Director; on January 15, 1998, the City appointed him as permanent Music Director.  As Music Director, Lewis was responsible for implementing and developing policy relating to music education, overseeing music curriculum development, supporting ninety-two music teachers, conducting inventories of musical instruments, organizing the Martin Luther King, Jr. celebration, and serving as liaison between the BPS and various music organizations in the City.

The Music Director was one of ten Senior Program Directors in the Department of Curriculum and Instructional

Practices ("Curriculum Department"), all of whom reported to the Director of the Department, Sid Smith ("Smith"), a white male. Smith reported directly to Timothy Knowles ("Knowles"), Deputy Superintendent for Teaching and Learning. In 1999, of these ten directors, four were African-American, one was Asian, and five were white.

During his tenure as Music Director, Lewis was a public advocate for increased funding for music education, particularly instrumental music instruction.[1] In a November 25, 1997 article, the Boston Herald reported that Lewis desired to expand instrumental music instruction and that to do so he proposed hiring new music instructors to travel among elementary and middle schools. Sometime in 1998, Lewis reduced this proposal to writing and shared it with a City Councilor. The proposal stressed that the City was in noncompliance with its own Arts Policy by not offering instrumental music instruction. To come within compliance, the proposal recommended that the City hire twenty new teachers at an approximate cost of $1,000,000, as part of a revived Itinerant Music Program. Lewis did not speak to his supervisors before sharing his written proposal with the City Councilor. According to Lewis, shortly thereafter, Smith told Lewis that the Superintendent, Thomas Payzant, was very upset with Lewis for

---

[1] By 1995, except in a few schools, the BPS had eliminated instrumental music instruction. In lieu of such instruction, the City offered music appreciation, singing, and rhythm.

speaking to the City Councilor.[2]  Smith also testified that he expressed his concern that Lewis should think about whether he was violating established protocol by talking to city council members about budget-related matters without first consulting Payzant.

Lewis was also quoted in a February 1, 1999 Boston Globe article.  The City's press office had directed the Boston Globe reporter to Lewis.  The article reported that instruments lay dormant in a warehouse, many of which had "rotted in the eight years since funding for instrumental music instruction was eliminated from the city's school budget."  The article did not reveal, and Lewis did not know, the source of this information.  Lewis was quoted as stating that the school system was trying to inform teachers of the existence and location of the instruments.  The article also discussed Lewis's desire to revive the Itinerant Music Program.  Lewis discussed the article with Smith and Payzant, and neither of them expressed any negative comments.  In March 1999, with Payzant present, Lewis addressed a City Council hearing, discussing the need for greater funding for music programs.

In late spring of 1999, the City instituted a system-wide reduction in force to fund transition programs[3] in literacy and

---

[2]The district court ruled that the statement was not hearsay based on an agency theory under Fed. R. Evid. 801(d)(2)(D). Because the City does not challenge that ruling, we will consider the statement.

[3]Transition programs provided additional support to students who were furthest behind and were not eligible for promotion.

mathematics, and to prepare students for the impending Massachusetts Comprehensive Assessment System tests ("MCAS"). Smith decided, with the approval of Knowles and Payzant, to eliminate the Music Director position and to spread Lewis's duties to other positions. The reorganization contemplated the creation of a new position, which consolidated the bulk of the Music Director duties with the day-to-day school responsibilities held by the Director of the Roland Hayes Division of Music[4], who would report directly to Knowles, rather than to Smith, as Lewis did. The Arts Director would assume the remaining responsibilities. By letter dated May 14, 1999, Payzant notified Lewis that the City was eliminating his position due to budget cuts. In addition to eliminating Lewis's position, the City terminated thirty-one other relatively high-level, supervisory employees.

The City posted the revised Roland Hayes position three times. Qualified candidates were required to have a master's degree and school-based management experience. The City formed a screening committee that reviewed applications and selected qualified candidates for interviews. A diverse group, the screening committee consisted of three African-Americans, one Hispanic, and one white. Although Lewis did not have a master's

---

[4]Roland Hayes Division of Music, located at Madison High School, was the City's single magnet school for music. In January, 1999, the Director of Roland Hayes, Robert Winfrey, retired. Greg Gozzola, a white teacher at Roland Hayes, temporarily assumed Winfrey's duties.

degree, he applied for the position, but was not selected for an interview. Instead, the City selected four candidates for interviews, including three African-Americans, all with the requisite master's degree and school-based management experience. The City did not hire any of the candidates, re-posted the position, and decided to keep Greg Gozzola, the teacher who had been filling in for Winfrey, as acting Director of Roland Hayes for the following academic year. Some of the district-wide responsibilities formerly held by Lewis were assumed by the Arts Director, Kathy Tosolini ("Tosolini"), a white female, and the remainder, such as the Martin Luther King, Jr. celebration, were assumed by other employees.

In 2000, the City re-posted the position, but reduced the district-wide responsibilities; Tosolini and others continued to cover those functions. Even though Lewis still did not have a master's degree,[5] the City mailed to him a written invitation to interview and called him to confirm on the morning it was scheduled. Lewis failed to appear for the interview, claiming that he never received the invitation and that by the time he received the call, he had a prior commitment. His interview was not rescheduled. Ultimately, the City offered the position to an African-American, but he declined. The position was re-posted, and

---

[5]Lewis received his master's degree on June 10, 2001.

remained unfilled at the time of the district court's summary judgment ruling.

## II

Lewis filed this civil suit against the City, alleging that, by eliminating his position and failing to hire him for the Roland Hayes position, the City retaliated against him for his public statements in violation of the First Amendment and because of his race in violation of Mass. Gen. Laws. ch. 151B, § 4. The district court granted summary judgment in favor of the City, finding that Lewis had adduced insufficient facts to support either claim.

## III

We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to Lewis, the nonmoving party, and drawing all reasonable inferences in his favor. Feliciano De La Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

A.        **Mass. Gen. Laws ch. 151B, § 4(1)**

To prevail on his chapter 151B claim, Lewis must prove that he "is a member of a protected class, [he] suffered harm as a result of [the City's] adverse employment action, and the [City] harbored discriminatory animus, which was the determinative cause of the adverse action." Weber v. Community Teamwork, Inc., 434 Mass. 761, 775, 752 N.E.2d 700 (2001). Because Lewis relies upon

circumstantial evidence of discrimination, we employ a familiar three-stage, burden-shifting paradigm first set out in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 116-18, 731 N.E.2d 1075 (2000). Lewis bears the initial burden of establishing a prima facie case of discrimination; doing so creates a presumption of discrimination. Id. at 116. The burden then shifts to the City to rebut the presumption by advancing a legitimate, nondiscriminatory reason for the employment decision. The City's obligation is one of production as opposed to persuasion, as the burden of persuasion remains with Lewis. Id. at 117. If the City meets its burden, the presumption of discrimination disappears. The burden returns to Lewis to establish that the basis of the City's decisions was unlawful discrimination, by adducing evidence that the reasons given by the City for its actions were mere pretexts to hide such discrimination. Id. at 118.

### 1. Elimination of the Music Director

We first decide whether Lewis established a prima facie case, mindful that the purpose of doing so is to eliminate the "most common nondiscriminatory reasons" for an employment decision, from which a fact finder might reasonably conclude that the employer made its decision because of race. Id. at 116. As Lewis was terminated as part of a district-wide reduction in force, he must show by a preponderance of the evidence that (1) he was a

member of a protected class under chapter 151B; (2) he performed his job satisfactorily; (3) he was terminated; and (4) the City did not treat race neutrally in making its decision to terminate him or retained personnel outside of his protected class in the same position. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993); cf. Wheatley v. Am. Tel. & Tel. Co., 418 Mass. 394, 397, 636 N.E.2d 265 (1994) ("It is our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. c. 151B.").[6]

It is undisputed that Lewis has established the first three elements; the battleground then is in the fourth prong. On appeal, for the first time, Lewis attempts to demonstrate that the City did not treat race neutrally in deciding whom to terminate by arguing that the lay-offs were statistically out of line with the overall racial makeup of the BPS workforce. See, e.g., Lipchitz v. Raytheon Co., 434 Mass. 493, 508-09, 751 N.E.2d 360 (2001) (holding that statistical evidence may support an inference that a particular decision was made because of discriminatory animus); Smith College v. MCAD, 376 Mass. 221, 228 n.9, 380 N.E.2d 121

---

[6]The fourth prong is slightly different in the non-reduction in force setting. In that context, the fourth prong requires that the employee establish that "his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's. . . ." Abramian, 432 Mass. at 116, 731 N.E.2d 1075. In the typical reduction of force case, however, the fourth prong is unworkable because the plaintiff's position no longer exists.

(1978) ("In a proper case, gross statistical disparities alone may constitute prima facie proof of a practice of discrimination."). Because Lewis failed to raise this theory below, we deem it forfeited.[7]  Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 258 (1st Cir. 1999) ("[A]lthough the court of appeals affords de novo review to orders granting summary judgment, it will not reverse such an order on the basis of arguments [or theories] that were not made in the trial court."); Utica Mutual Ins. Co. v. Weathermark Investments, Inc., 292 F.3d 77, 80-82 (1st Cir. 2002); see generally, Wright & Miller, supra note 7, § 2716, at 282.

Lewis also contends that "only black Senior Program Directors were laid off," from which a jury could infer that the City targeted him because of race.  But Lewis was the only Senior Program Director in the Curriculum Department to be terminated; the remaining three African-American Senior Program Directors retained

_____

[7]Even if we were to consider the argument, we would find the record devoid of any evidence revealing a gross statistical disparity.  Lewis attempts to present the demographic makeup of the BPS workforce through factual representations in a footnote to his appellate brief.  It is elementary, however, that we review the record as it existed at the time the district court rendered its ruling, Crawford v. Lamantia, 34 F.3d 28, 31 (1st Cir. 1994); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2716, at 282 (3d ed. 1998); cf. Fed. R. App. P. 10(a) (West 2002) (setting forth the composition of the record for appeal), and we disregard factual assertions made in briefs and other self-serving documents that are not otherwise supported by competent evidence as required by Rule 56(e), Vivid Tech., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 812 (1st Cir. 1999); Nieves v. Univ. of Puerto Rico, 7 F.3d 270, 276 n.9 (1st Cir. 1993); Wright & Miller, supra, § 2723, at 389-90.

their positions. We fail to see how a jury could reasonably infer that the City targeted Lewis due to his race merely because he was the one Senior Program Director, out of ten, who was terminated. Cf. LeBlanc, 6 F.3d at 844 ("We . . . question whether a company can be said not to treat age neutrally as a matter of law merely because two of the three people it discharges pursuant to a reduction in force belong to the protected class. A sample of three is a small number from which to draw deductions of this sort.").

Lewis also relies on the City's retention of the other Senior Program Directors who were not in his protected class.[8] Lewis points to no convincing evidence that shows how the positions held by the other directors may reasonably be considered the same as the position that Lewis held. Lewis himself testified that "there's no comparable position" to his former position, unless the City were "to make a position [of] Director of Fine Arts, . . . but--right now, that position doesn't exist . . . ." In any event, the record emphasizes the differences, not the similarities, between the positions. Each Senior Program Director was responsible for a specific academic discipline: English, which included two directors (one for elementary and one for secondary

_____

[8]Lewis's brief states that "all the other Senior Program Directors . . . were not in Lewis's protected class" and that all were retained. This is a misstatement of the record, as three of the other directors were African-American.

-11-

education), math, science, history, world languages, music, art, physical education, and health. The duties and responsibilities of each of the directors were defined by the specific academic discipline to which they were assigned. Within an assigned discipline, the director established and implemented performance standards, curriculum guidelines, and professional development programs, and supported teachers throughout the BPS. Smith also testified, uncontroverted by Lewis, that the City disregards seniority when instituting a reduction in force within the Curriculum Department because the City does not view the Senior Program Director positions as being of similar character.

Lewis makes much of the fact that the Arts and Music Director positions had the same personnel grade and salary and were listed on a single job posting. Although true, Lewis ignores significant differences. The Arts Director covered three subject areas: visual arts, theater, and dance. Among other things, she supported 151 art teachers, established and implemented the Arts and Education Policy for the BPS, coordinated programs with the Museum of Fine Arts, and coordinated after-school and other programs not coordinated by the Music Director. On this record, no fact finder could reasonably conclude that any of the other directors were in the same position as Lewis.

Relying upon Flebotte v. Dow Jones & Co., 51 F. Supp.2d 36, 40 (D. Mass. 1999), Lewis attempts to avoid our inevitable

conclusion by asserting that the City's delegation of his duties to other individuals not in his protected class amounted to retaining individuals in the same position. We disagree. The purpose of the prima facie case is to identify those circumstances where the employer's actions, if left unexplained, are more likely than not based on unlawful discrimination. In the typical reduction in force case, the employer's actions have already been explained, as the reduction in force is itself a legitimate, nondiscriminatory reason for the lay-offs. And as recognized by the district court, "in a reduction in force situation, a company generally reorganizes its workforce and reassigns responsibilities to reduce headcount and save money." Lewis v. City of Boston, No. CIV. A. 00-11548, 2002 WL 523910, at *5 (D. Mass. March 29, 2002). Merely demonstrating that, as a result of the reduction in force, the employer consolidated positions or allocated duties of discharged employees to other existing employees does not itself raise a reasonable inference that the employer harbored discriminatory animus toward any one employee. Accepting Lewis's argument "would render meaningless the fourth requirement of the prima facie case" under LeBlanc. Id. We are careful not to suggest, however, that an employer may mask unlawful discrimination by simply transferring all of an employee's duties to another employee during a reduction in force. Rather, we are saying that the employee must come forward with something more than evidence of the inevitable

transfer of his or her responsibilities to existing employees. This Lewis has failed to do.[9]

Finally, Lewis for the first time contends that his position was not, in fact, eliminated, reasoning that the duties of the Roland Hayes Director were merely added to the position he formerly held. This argument is unavailing. The evidence in the record, adduced by both the City and Lewis, leaves beyond question that the City eliminated the Music Director position from the Curriculum Department and consolidated the duties of that position with that of the former Roland Hayes Director and the Arts Director. There simply is no genuine issue of material fact as to whether his position was eliminated. We hold therefore that Lewis failed to establish a prima facie case of racial discrimination.

Even if we were to assume arguendo that Lewis satisfied his prima facie burden, we would still affirm. The City proffered a number of legitimate reasons why it chose Lewis's position for elimination during its search for additional funds for transition programs in literacy and mathematics and to prepare students for the MCAS tests. Smith, who made the decision, testified that the Music Director position was the natural candidate for elimination

---

[9]Of course, an employee is free to establish that the reduction in force is itself a sham. Lewis, however, does not challenge the legitimacy of the City's system-wide reduction in force; indeed, at oral argument, he agreed that the City undertook the reduction in force, in part, to focus more resources to prepare students for the impending MCAS tests.

in his Department because music was not a priority subject area[10]; aside from English, the Arts was the only subject area that had two Senior Program Directors; and the duties of the Music Director could be easily transferred to the Arts Director and the Roland Hayes position, which would result in one less person doing the work. In addition, transferring district-wide duties to the Roland Hayes position and creating a new Director position that was under the supervision of the Deputy Superintendent would achieve the City's goal of raising the status and visibility of the Roland Hayes position. The City's reasons sufficiently dispel any taint of racial discrimination.

Beyond the thin evidence Lewis relies upon to satisfy his prima facie case, Lewis presented no evidence to support a reasonable inference that any of the reasons given by the City were false. That evidence does not by itself even suggest that the reasons advanced by the City were a pretext for discrimination. The City's decision to discharge Lewis is not actionable under chapter 151B.

2.      **Failure to hire for the Roland Hayes position**

Again, Lewis relies on indirect evidence of racial discrimination. To establish a prima facie case, Lewis must establish that (1) he is a member of a protected class under 151B;

---

[10]The MCAS tests covered English, mathematics, history, science, and world languages.

(2) he applied for an open position; (3) he was not hired; and (4) the City sought to fill the position with individuals who had qualifications similar to his. Wynn & Wynn v. MCAD, 431 Mass. 655, 666 n.22, 729 N.E.2d 1068 (2000). The district court held that Lewis failed to establish a prima facie case because he was not qualified, as he lacked a master's degree and school-based management experience. Lewis responds that there exists a genuine issue as to whether he was qualified, pointing out that the City appointed him as Music Director in 1995, which required a master's degree, and invited him to interview for the second posting, even though the qualifications for the position had not changed and he still did not have a master's degree. We will assume, without deciding, that Lewis has satisfied his prima facie burden, and turn to the second stage of the McDonnell-Douglas paradigm.

We think it important to review each posting separately, not only because Lewis raises distinct challenges to each of them, but also because doing so exposes the lack of substance to his claims. Lewis does not challenge the first committee's decision not to select him, conceding at oral argument that the first selection committee, which included three African-Americans, did not discriminate against him based upon his race. Instead, Lewis contends that the City, because of his race, stacked that committee

-16-

with two members, Winfrey and Ruth Howe[11], both African-Americans, who it knew were biased against him and would not select him. This is mere conjecture. Although there is evidence that Smith, Knowles, and Payzant knew that Lewis and Winfrey had conflicts in the past over Roland Hayes,[12] not one of them selected the committee members. The committee members were selected by the Deputy Superintendent, Amalle Cudiero Nelson, who also chaired the first committee. Not only has Lewis failed to present any evidence that Nelson knew that any of the members of the committee were biased against him, but, more significantly, he has also failed to show that Nelson otherwise, because of his race, stacked the committee against him. Given Lewis's concession that the committee did not discriminate against him due to his race, we will proceed to the second posting.

We need not dwell at length on the second posting as we find that Lewis has failed to adduce any evidence even suggesting that he was not hired due to his race. The City adduced ample evidence that Lewis took himself out of contention for the position: it is uncontested that Lewis failed to appear for the

---

[11]Howe was a member of the Friends of Roland Hayes, which was an outside advocacy group for Roland Hayes Division of Music.

[12]As to Ruth Howe, there is absolutely no record support for the assertion that she was somehow biased against Lewis. Lewis invites us to speculate that because she was, at the time, a member of the Friends of Roland Hayes, she was biased against him. We decline the invitation.

scheduled interview.  Nevertheless, Lewis points out that after failing to show for the scheduled interview, he sent a facsimile to the City's Human Resources Director, with a copy to Knowles, requesting that the interview be rescheduled.  While the Director did not reschedule, there is absolutely no evidence remotely suggesting that the City, through its Human Resources Director, failed to reschedule his interview because of his race.  In any event, even more telling of a lack of discriminatory animus, the City offered the position to an African-American, a person in Lewis's protected class.  Based on this record, a jury could not reasonably conclude that the City failed to hire him because of his race.[13]

**B.      First Amendment**

Lewis also claims that the City deprived him of his First Amendment rights, in violation of 42 U.S.C. § 1983,[14] by retaliating against him for his statements to the press in 1997 and 1999 and to

---

[13]The position was re-posted and remained open at the time of the district court's rulings.  In his appellate brief, Lewis's counsel alleges that Lewis was not hired after the third posting even though he had a master's degree.  These facts are not properly before us, see supra note 7, and in any event, there is no evidence in the record providing the details of the hiring process from which an inference of discriminatory animus may be properly drawn.

[14]Lewis also based his claim on the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11H-I.  Lewis does not appeal the district court's ruling that the City could not be held liable under MCRA because the City is not a "person" for purposes of the Act.

members of the City Council in 1998 and 1999.[15]  To prevail on his claim, as a public employee, Lewis must establish that (1) his expression involved matters of public concern; (2) his interest in commenting upon those matters outweighed the City's interests in the efficient performance of its public services; and (3) his protected speech was a substantial or motivating factor in the City's adverse employment actions.  Mullin v. Town of Fairhaven, 284 F.3d 31, 37-38 (1st Cir. 2002) (citing Connick v. Myers, 461 U.S. 138, 147-48 (1983); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977); Pickering v. Bd. of Educ., 391 U.S. 563 (1968)); Nethersole v. Bulger, 87 F.3d 15, 18 (1st Cir. 2002).  The first two prongs are questions of law and thus are subject to de novo review, whereas the third prong is generally for the fact finder to decide.  Nethersole, 287 F.3d at 19; O'Connor v. Steeves, 994 F.2d 905, 913 (1st Cir. 1993).   If Lewis succeeds in establishing a prima facie case, the burden of persuasion shifts to

---

[15]We uphold the district court's ruling, unchallenged by the City, that Lewis could bring his First Amendment claim under § 1983, even though Lewis failed to name individual defendants in their personal capacity.  The trial court found that the City's "decision was made as part of the budgetary process and constituted a deliberate policy determination with respect to the structure of the music education program in the public schools," and thus the City, through its policy makers--Payzant, Knowles, and Smith, was the "moving force behind the decision."  Lewis v. City of Boston, No. CIV. A. 00-11548, 2002 WL 523910, at *10 (D. Mass. March 29, 2002) (citing Bd. Of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997); City of Canton v. Harris, 489 U.S. 378, 389 (1989); Monell v. New York Dep't of Soc. Services, 436 U.S. 658, 694 (1978)).

the City to prove by a preponderance of the evidence that Lewis's position would have been eliminated "even in the absence of the protected conduct." <u>Mt. Healthy,</u> 429 U.S. at 287.

The City does not challenge the district court's ruling in favor of Lewis on the first two prongs; we therefore proceed to the third prong. Lewis is not required to come forward with direct evidence (the so-called smoking gun) that his speech was a substantial or motivating factor, but rather, as in other contexts where motivation is an issue, he can rely upon circumstantial evidence. Having considered the briefs and thoroughly reviewed the entire record, we agree with the district court that Lewis failed to adduce any evidence suggesting that his speech played a substantial or motivating role in the City's decisions.

To establish the essential nexus, Lewis stresses the temporal proximity between his public statements to the press and to City Council members and the City's decision to eliminate his position. Lewis also notes that Smith told him that Payzant was very upset after Lewis shared his proposal with a City Councilor in 1998. From these facts, Lewis believes that a jury could conclude that his speech was a substantial or motivating factor in the City's decision. We disagree.

Although "'close temporal proximity between two events <u>may</u> give rise to an inference of causal connection,'" <u>Nethersole,</u> 287 F.3d at 20 (emphasis added) (quoting <u>Hodgens</u> v. <u>Gen. Dynamics</u>

-20-

Corp., 144 F.3d 151, 168 (1st Cir. 1998)), that inference is "not necessarily conclusive" where, as in this case, the inference is considerably weakened by other facts in the record, Hodgens, 144 F.3d at 170.  Here, Lewis started his public advocacy for more funding for music programs in 1997, over a year and a half before he was terminated, a fact that seriously undermines his temporal proximity argument.[16]  Moreover, after reviewing Lewis's public statements, we doubt that a fact finder could reasonably conclude that they were in any way critical of the City or its supervisors; Lewis merely commented on the need for more funding and his desire to revive instrumental music instruction.  In any event, we find no evidence that any of his supervisors, including Smith, who made the decision to eliminate Lewis's position, were anything but supportive of his comments.  After his statements appeared in the

---

[16]Facing this problem before the district court, Lewis argued that the relevant time period on which the court should focus is the spring of 1999, when the level of public interest about funding of music and arts programs was high. Lewis attempts a different course on appeal, alleging that the causal link between his 1997 statements in the Boston Herald and the decision to terminate him remained unbroken, as the City engaged in retaliatory actions by no longer sending him communications regarding music, excluding him from the Arts Policy Committee, denying him an adequate budget, and failing to adequately respond to interferences with his workspace by other employees.  The record demonstrates that Lewis believed that, aside from failing to rectify his workspace complaints, the City, because of Lewis's race, engaged in the other so-called retaliatory actions since 1995.  As to the City's failure to respond to his workspace complaints, we seriously doubt whether it constitutes a sufficient adverse employment action for First Amendment purposes; but even if it does, we find no evidence linking his 1997 statements to the City's lack of response to his complaints.

1997 <u>Boston Herald</u>, the City promoted Lewis from acting to permanent Music Director, encouraged him to start a parent advocacy group, and assisted him in gaining access to the musical instruments at Roland Hayes. Indeed, Lewis testified that he discussed the <u>Boston Globe</u> article with Payzant because, at the time, Payzant was assisting Lewis in distributing instruments throughout the City, the goal that Lewis was quoted as trying to achieve. And it was the City, through its press office, that directed the <u>Boston Globe</u> reporter to Lewis.

Even more significant, the inference carried by the temporal proximity between his statements in 1999 and the decision to terminate him dissipates when consideration is given to the attendant circumstances. The City adduced ample evidence that Lewis's position was eliminated along with thirty-one others during a reduction in force resulting from the impending MCAS tests. Lewis presented no credible evidence demonstrating that the reasons advanced by the City were pretexts from which a fact finder could infer discriminatory animus.

We are also unconvinced that Smith's alleged statement that Payzant was very upset sufficiently links Lewis's protected activity to the decision to terminate him. The record evidence does not suggest that Smith, the person who decided to eliminate the position, shared Payzant's claimed view or that he was concerned with anything beyond protocol.

Even were we to assume that Lewis met his prima facie burden on such thin circumstantial evidence, he could not avoid summary judgment because the City sufficiently established the <u>Mt. Healthy</u> defense. We find that the City demonstrated by a preponderance of the evidence that it would have reached the same decision regardless of Lewis's speech. Lewis failed to present evidence, direct or circumstantial, to refute even one of the reasons given by the City. It would be pure conjecture to conclude that the City would have made a different decision in the absence of Lewis's comments.

## IV

Having found that Lewis has failed to meet his burden of adducing sufficient facts to survive a motion of summary judgment on both his First Amendment and Chapter 151B claims, **we affirm.**