# United States Court of Appeals

## For the First Circuit

No. 13-2272

MICHAEL DUNN,

Plaintiff, Appellant,

v.

TRUSTEES OF BOSTON UNIVERSITY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Thompson, Circuit Judges
and Laplante,* District Judge.

Lana Sullivan, with whom Ronald M. Davids was on brief, for plaintiff-appellant.
Lawrence S. Elswit for defendants-appellants.

July 30, 2014

*Of the District of New Hampshire, sitting by designation.

**LAPLANTE, <u>District Judge.</u>** Michael Dunn appeals the entry of summary judgment against him on his claim that his former employer, Boston University ("BU"), discharged him because of his age in violation of the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B, § 4.1B. The district court ruled that Dunn had failed to make out a prima facie case of age discrimination. Without ruling on the sufficiency of Dunn's prima facie showing we affirm. Even assuming that Dunn made that prima facie showing, he failed to demonstrate a genuine issue of material fact as to whether BU's stated reasons for discharging him, as part of a reorganization of its information technology department, were pretextual.

**I.**

**A.**

We set forth the facts in the light most favorable to Dunn. <u>See, e.g.</u>, <u>Ponte</u> v. <u>Steelcase, Inc.</u>, 741 F.3d 310, 313 (1st Cir. 2014). After receiving a bachelor's degree in computer engineering, in 1987, Dunn worked for a year or so as a hardware support specialist before becoming a systems administrator and, later, the manager of the computer support center, for a Massachusetts company with 1,500 employees. In 1992, Dunn began working for BU, as a computer hardware repair technician. After several promotions, in the fall of 2009, at age 47, Dunn assumed the title of "Assistant Director of Distributed Computing," a group

within BU's Information Services & Technology ("IS&T") department. In this job, Dunn supervised nine employees providing high-level desktop computer services and support to faculty and staff.

Earlier in 2009, BU had hired Tracy Schroeder, age 38, as the vice president of IS&T. Schroeder began making organizational changes, including the merger of the distributed computing group with another group within IS&T known as the "IT help center." The purpose of that change, Schroeder explained, was to "improve the efficiency of the department by bringing staff . . . who [were] performing similar functions together in teams" and "to reduce the fragmentation of the [department's] presentation to the client community," i.e., BU's students, faculty, and staff. This merger resulted in the elimination of the distributed computing group, and the layoff of its director (and Dunn's immediate supervisor), Stephen Rosman, who was 59 years old at the time.

The merger also resulted in a title change for Dunn, who became "manager of field support" for the IT help center in October 2009. Dunn retained the same salary and benefits, but lost managerial responsibility over four employees, and viewed the title change as a demotion. Within two months or so, however, those employees were re-assigned to work under Dunn after their supervisor quit. Dunn reported to Stacy Gianoulis, age 50, a project director in the help center.

In February 2010, as part of the continued restructuring of the IS&T department, Dunn became "manager of desktop services-field support," while Jill Beckman, who was then around 30 years old, became "manager of desktop services-central support." Beckman, who holds an undergraduate degree in music synthesis (a major she described as "all about music and computers"), had started working at BU in 2001, before she completed college. She began as a "technical consultant" at University Computers, a BU-operated computer store, diagnosing and repairing hardware and software problems. In 2006, Beckman was promoted to the position of "manager of technical services" at the store, so that its technical consultants reported to her. During her time at University Computers, Beckman worked with different "ticketing systems" used to track service requests, contributing to the development of two such systems (known as "Oompa" and "OneHelp").

In April 2010, Gianoulis called Dunn to apprise him of some further upcoming organizational changes, including that, due to overwork, the employee then serving as "manager of the service desk" would have her title changed to "manager, accounts and student services" and be relieved of her responsibilities over the service desk itself. Gianoulis explained that this would open a new "service desk manager" position, but that "he [was] really looking for a younger person in that role." Dunn did not express any interest in the new position, which, as he testified at his

-4-

deposition, offered a "lesser grade [and] pay" than the job he had at the time.  Ultimately, BU hired a 35-year-old for the service desk manager job.

A few weeks later, in early May 2010, Gianoulis submitted a written proposal to Schroeder for reorganizing the desktop services group.  In addition to dividing the responsibilities of the manager of the service desk, as just discussed, this proposal combined the responsibilities of the "central support" position held by Beckman and the "field support" position held by Dunn into a single new position, "manager of the [d]esktop [s]ervices team." Gianoulis explained that, while desktop services had initially been divided into the "field support" and "central support" teams, "each with its own manager, as we worked through the merger . . . [a]s these two groups become more integrated and with the adoption of OneHelp as our ticketing system it is clear there needs to be one operational manager of the Desktop Services team to manage the day to day support activities."

Gianoulis further proposed that the new manager of desktop services position be given to Beckman, citing her "history and performance of actively managing a support group" and "knowledge of service management systems," as well as her role in developing "OneHelp," the ticketing system.  A job description for the "manager of desktop services" position  awarded to Beckman had been completed in October 2009, but, contrary to written BU policy,

was never posted in its job listings (though Gianoulis did discuss the written reorganization proposal with an employee in BU's human resources department, who said she had "no objections"). Nor did Schroeder or Gianoulis consider any candidates for the job besides Beckman.

Gianoulis also proposed that Dunn--who was 47 years old at that point--would be laid off. The restructuring of the desktop services group affected other older employees as well, though none adversely: three employees in their 40s received promotions, while a 56 year-old and a 60-year-old retained their jobs. Schroeder approved Gianoulis's proposal and, on May 25, 2010, Gianoulis informed Dunn that his job was being eliminated due to restructuring.

At his deposition in this case, Gianoulis testified that Dunn "was never considered for" the manager of desktop services position because Beckman "was already doing the role" in her prior job as manager of desktop services-central support. Gianoulis explained that, during Beckman's time in that job, she "provided desktop support to students, staff and faculty . . . in a high volume environment." Dunn's role as field support manager, Gianoulis recalled, was more limited, "only supporting a select group of administrative staff" and doing "a lot of vendor negotiation," as well as "business applications support" for the "select group of clients that he supported." Gianoulis added that

-6-

Dunn had "told [him] specifically that he wasn't interested in desktop support, he was interested in Windows system management," which he considered "his area of expertise."

**B.**

In November 2010, Dunn filed a charge of discrimination against BU with the Massachusetts Commission Against Discrimination. He subsequently withdrew the charge and brought suit against BU in Massachusetts Superior Court, claiming age discrimination in violation of both the federal Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq., and its state-law analog, Mass. Gen. Laws ch. 151B, § 4.1B. BU removed the case to the district court, invoking its federal question jurisdiction. 28 U.S.C. § 1331.

In due course, BU filed a motion for summary judgment, see Fed. R. Civ. P. 56, arguing that Dunn could not establish a prima facie case of age discrimination under either federal or state law and that, in any event, BU had legitimate, nondiscriminatory reasons for laying off Dunn, who lacked evidence that those reasons were pretextual. Dunn's first response to BU's summary judgment motion was a motion seeking voluntary dismissal of his ADEA claim with prejudice, see Fed. R. Civ. P. 41(a)(2), and for the district court to decline to exercise supplemental jurisdiction over the remaining state-law age discrimination claim, see 28 U.S.C. § 1367(c)--relief which, if granted, would have

resulted in remand of the case to the superior court.  As the basis for this motion, Dunn stated that "the standard on summary judgment for discrimination claims arising under federal law is significantly less liberal than the standard on summary judgment for discrimination claims arising under state law."  In a decision that Dunn has not questioned on appeal, the district court dismissed the ADEA claim, but refused to remand the chapter 151B claim to state court, declaring that "such forum shopping is clearly improper."  Dunn v. Trs. of Boston Univ., No. 11-10672, 2013 WL 5235167, at *2 (D. Mass. Sept. 16, 2013).

After Dunn filed his opposition to BU's summary judgment motion, the district court heard oral argument on it and, as noted at the outset, granted the motion, ruling that Dunn had not made out a prima facie case that he was laid off because of his age. Id. at *7.  As a result, the district court did not reach BU's alternative argument that, even if Dunn could establish a prima facie case of age discrimination, he could not demonstrate a genuine issue as to whether BU's stated reasons for laying him off were pretextual.  This appeal followed.

**II.**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is

-8-

such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it has the potential of determining the outcome of the litigation."  Patco Constr. Co. v. People's United Bank, 684 F.3d 197, 206-07 (1st Cir. 2012) (quotation marks omitted).

We review the district court's entry of summary judgment de novo, "draw[ing] all reasonable inference in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation."  Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014) (quotation marks and bracketing omitted).  We are not wedded to the district court's rationale, but may affirm the entry of summary judgment on any ground supported by the record.  See, e.g., Boston Prop. Exch. Transfer Co. v. Iantosca, 720 F.3d 1, 10 (1st Cir. 2013).

## III.

"Generally, a plaintiff who is terminated from [his] position establishes a prima facie case of discrimination by producing evidence that [1] [he] is a member of a class protected by [Mass. Gen. Laws] ch. 151B; [2] [he] performed [his] job at an acceptable level; [3] [he] was terminated; and [4] [his] employer sought to fill [his] position by hiring another individual with qualifications similar to [his]."  Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 531 (Mass. 2005).  As the Supreme Judicial Court has explained, however, the "fourth element is nonsensical in

-9-

a reduction in force case: the plaintiff is not replaced, nor does [his] employer 'seek to fill' the position, for the very purpose of a workforce reorganization is generally to reduce the number of employees." Id.

In Sullivan, then, the Supreme Judicial Court "consider[ed] how the fourth element of a prima facie case must be varied so that a plaintiff who is laid off during a reduction in force may establish a prima facie case of unlawful discrimination," id., holding that a plaintiff does so "by producing some evidence that [his] layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination." Id. at 533-34; see also Woodward v. Emulex Corp., 714 F.3d 632, 637-38 (1st Cir. 2013) (explaining that "[w]here the employer does not replace the plaintiff with a new employee . . . some evidence that the employee's layoff occurred under circumstances that would raise a reasonable inference of discrimination is necessary to establish the fourth prong" of a prima facie age discrimination case under Massachusetts law).

Applying Sullivan, the district court ruled that Dunn had failed to produce any such evidence. Dunn challenges this ruling on two principal grounds. First, he argues that the transfer of his responsibilities to the younger Beckman sufficed, in and of itself, to establish a prima facie case of age discrimination, regardless of the additional circumstances of his layoff. That is

incorrect, as we explain below.  Second, Dunn argues that the circumstances of his layoff demonstrated a reasonable inference of age discrimination in that (a) "Schroeder and Gianoulis deviated from the standard application of University hiring policies and procedures" in giving Beckman the manager of desktop services job, (b) Dunn's qualifications for that position were superior to those of Beckman, and (c) Gianoulis stated to Dunn, in April 2010, that Gianoulis was "really looking for a younger person" for a different job, that of service desk manager.  As discussed infra, we conclude that, even if these facts suffice to make out a prima facie case under Mass. Gen. Laws ch. 151B, § 4.1B, they fail to create a genuine issue as to whether BU's stated reasons for laying Dunn off were pretexts for age discrimination.

## A.

Dunn argues that "[t]he mere fact that an 18 year difference existed between Dunn and Beckman should be sufficient for Dunn to establish a prima facie case."  In Sullivan, however, the Supreme Judicial Court specifically declined to follow decisions holding that a plaintiff challenging his layoff can establish the fourth element of a prima facie case of discrimination "by showing, in [an] age discrimination claim, that an employee at least five years younger than [him] was retained." 825 N.E.2d at 532 (quotation marks omitted).  The Supreme Judicial Court "rejected that formulation, as such evidence is insufficient

-11-

to establish a legally mandatory, rebuttable presumption of unlawful discrimination." Id. (quotation marks omitted).

Emphasizing that "his entire job was given to Beckman," Dunn argues that he made out a prima facie case on the theory that "the employer retained unprotected or younger workers in the same position." It is true that, in Sullivan, the court acknowledged that, "in some reduction in force cases, the fact that an employer retained in the plaintiff's same position an employee outside the plaintiff's protected class may indeed be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff." Id. at 533. In a case that Sullivan called a "satisfactory" model for Massachusetts law, id. at 532, this court has endorsed the same view as a matter of federal employment law. See Currier v. United Techs. Corp., 393 F.3d 246, 256 (1st Cir. 2004).

What Dunn fails to acknowledge, however, is that this court has also (in another case cited approvingly in Sullivan, 825 N.E.2d at 532) expressly rejected the argument that an employer's "delegation of duties to other individuals not in [the plaintiff's] protected class amount[s] to retaining individuals in the same position" so as to make out a prima facie case of discrimination under either federal or Massachusetts law. Lewis v. City of Boston, 321 F.3d 207, 216 (1st Cir. 2003). As this court explained, "[m]erely demonstrating that, as a result of the

-12-

reduction in force, the employer consolidated positions or allocated duties of discharged employees to other existing employees does not itself raise a reasonable inference that the employer harbored discriminatory animus toward any one employee."[1] Id. Here, then, the fact that BU reorganized the desktop services group by consolidating the field and central support manager jobs into a single position, and awarding that position to an employee less than 40 years old instead of to Dunn, does not raise a reasonable inference that the basis for that decision was Dunn's age (any more than it would suggest, since Beckman is a woman and Dunn is not, that the basis for that decision was Dunn's sex).

Despite Dunn's suggestion to the contrary, it makes no difference that, while his position was eliminated in the reorganization, "the functions that Dunn performed were not." Indeed, by definition, a reduction-in-force accomplished by consolidating positions and reallocating duties results in the

---

[1] Dunn seems to suggest that this case does not present a true "consolidation" or "reallocation," either because "Beckman was not doing any part of Dunn's job as desktop services manager" previously, or because "Dunn's job functions were not dispersed among several different employees" but given entirely to Beckman. We fail to see how either of those facts is essential to a "consolidation" or "reallocation" as this court described those concepts in Lewis, and Dunn does not explain further. It suffices to say, then, that we find Lewis instructive because the reorganization at issue here quite closely resembles the reorganization at issue there. 321 F.3d at 212 (noting that the defendant decided "to eliminate the [plaintiff's] position and to spread [his] duties to other positions," including a "new position, which consolidated the bulk of [the plaintiff's] duties with [other] responsibilities" of a different existing position).

-13-

elimination of one or more positions, rather than in the elimination of their functions. Again, this court held in <u>Lewis</u> that "an employee must come forward with something more then evidence of the inevitable transfer of his or her responsibilities to existing employees" to make out a prima facie case of a discriminatory layoff. <u>See</u> <u>id.</u>

Dunn maintains that such a transfer demonstrates "the continuing need for the work that the employee was performing prior to his termination"--a fact which, he says, this court deemed "sufficient to make out a prima facie case of discrimination" in its decisions in <u>Rodriguez-Torres</u> v. <u>Caribbean Forms Mfr. Inc.</u>, 399 F.3d 52 (1st Cir. 2005) and <u>Hidalgo</u> v. <u>Overseas Condado Ins. Agencies, Inc.</u>, 120 F.3d 328 (1st Cir. 1997). Dunn's reliance on those cases is misplaced. In relevant part, they recognize simply that an employer's continuing need for the plaintiff's services can establish the fourth element of a prima facie case of discriminatory termination, i.e., that he or she was replaced, even if the employer does not in fact hire a replacement. <u>See</u> <u>Rodriguez-Torres</u>, 399 F.3d at 59; <u>Hidalgo</u>, 120 F.3d at 332-33.

As already noted, though, the requirement that a plaintiff prove his "replacement" as part of his prima facie showing of discriminatory termination "is nonsensical in a reduction in force case," where "the plaintiff is not replaced" since "the very purpose of a workforce reorganization is generally

-14-

to reduce the number of employees."[2]  Sullivan, 825 N.E.2d at 531;
see also Woodward, 714 F.3d at 638 ("The fourth prong [of the prima
facie case standard for discriminatory termination claims] does not
apply to a reduction-in-force case . . . where the employer does
not replace the plaintiff with a new employee.").  Dunn is wrong,
then, that BU's "continuing need" for someone to perform his
duties, as evinced by the fact of their reassignment to Beckman,
establishes a prima facie case that he was terminated due to his
age.  The district court was correct that, for Dunn to make out
such a case, he had to come forward with evidence beyond the mere
fact that BU laid him off and reassigned his responsibilities to an
employee younger than 40.  See Sullivan, 825 N.E.2d at 531.

**B.**

Dunn also argues that, even putting that fact aside, he
produced additional "evidence that [his] layoff occurred in
circumstances that would raise a reasonable inference of unlawful
discrimination" so as to make out a prima facie case that he was
terminated due to his age.  Id. at 533-34.  If a plaintiff
successfully establishes a prima facie case of employment
discrimination, the defendant must respond "by articulating a
lawful reason for its employment decision and producing credible
evidence that the reason or reasons advanced were the real

---

[2]Indeed, both Rodriguez-Torres, 399 F.3d at 59 n.5, and
Hidalgo, 120 F.3d at 334 n.5, specifically noted that they did not
involve reductions-in-force.

-15-

reasons." Id. at 538 (quotation marks and bracketing omitted); see also, e.g., Woodward, 714 F.3d at 638 (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). The defendant's "burden at this stage is one of production and not persuasion; it need not prove that the reasons were nondiscriminatory." Sullivan, 825 N.E.2d at 538 (quotation marks omitted); see also Woodward, 714 F.3d at 638. If the employer meets its burden of production, "[t]he burden returns to [the plaintiff] to establish that the basis of [the defendant's] decision was unlawful discrimination by 'adducing evidence that the reasons given by [the defendant] for its actions were mere pretexts to hide such discrimination.'" Sullivan, 825 N.E.2d at 550 (quoting Lewis, 321 F.3d at 214).

The district court did not decide whether BU had articulated a nondiscriminatory reason for terminating Dunn or, if so, whether Dunn had responded with evidence that the stated reason was a pretext for age discrimination. Instead, the district court ruled that Dunn, relying on his mistaken theory that the reassignment of his duties to an employee under 40 could itself establish a prima facie case of age discrimination, had not come forward with additional evidence on that point, i.e., that his layoff occurred in circumstances that would raise an inference of unlawful discrimination. We need not decide whether that ruling was correct. Again, we may affirm on any basis supported by the record. See Boston Prop. Exch. Transfer Co., 720 F.3d at 10.

-16-

Because, in trying to demonstrate pretext to the district court, Dunn relied on the same evidence he used to try to make a prima facie case, we can simply assess whether that evidence demonstrates a genuine issue of pretext without assessing whether the same evidence demonstrates a prima facie case. Cf. Lewis, 321 F.3d at 216-17 (rejecting the argument that plaintiff had shown a prima facie case of a discriminatory layoff by showing the reassignment of his duties to nonprotected employees, then proceeding to rule that, even had he made out a prima facie case, the record lacked evidence that the employer's explanation for the layoff was a pretext for discrimination). Here, the record is devoid of evidence that BU's stated reasons for laying off Dunn are pretext for discriminating against him due to his age.

To start with, BU has articulated legitimate reasons, with support in the record, both for eliminating Dunn's job, as its duties were consolidated with those of Beckman's to create the manager of desktop services position, and for awarding that position to Beckman, rather than to Dunn. As Gianoulis explained in proposing these changes, the increasing integration of the field and central support divisions of the desktop services group called for their consolidation under a single manager. See Alvarado-Santos v. Dep't of Health of P.R., 619 F.3d 126, 132 (1st Cir. 2010) (recognizing that "greater uniformity and efficiency" are legitimate reasons for consolidating managerial responsibilities).

-17-

Gianoulis also explained that the desktop services job should go to Beckman in light of her "history and performance of actively managing a support group" and "knowledge of service management systems." Those reasons are also facially legitimate. See, e.g., Sullivan, 825 N.E.2d at 538 (ruling that, in deciding which employees to lay off, an employer can "determine which of [them] would best meet its ongoing business needs," including by considering their "particular expertise").

The question becomes, then, whether the record contains "'evidence sufficient to support a jury verdict that it was more likely than not that the[se] articulated reason[s] [were] a pretext for unlawful discrimination.'" Woodward, 714 F.3d at 638 (quoting Matthews v. Ocean Spray Cranberries, Inc., 686 N.E.2d 1303, 1309 (Mass. 1997) (further quotation marks omitted)). In the district court, Dunn argued that he had demonstrated a genuine issue as to pretext on three grounds: (1) Beckman's alleged lack of qualifications for the manager of desktop services job; (2) the "deviat[ion] from the standard application of University hiring policies and procedures" in awarding that job to Beckman; and (3) Gianoulis's statement to Dunn, in April 2010, that Gianoulis was "really looking for a younger person" for the position of service desk manager. For the reasons set forth below, we reject these arguments.

First, Dunn asserts that "Beckman's credentials were not even remotely what was qualified" for the manager of desktop services job created as a result of the consolidation. Dunn's only record support for this assertion, however, is the fact that, previously, "Beckman worked in the IT Help Center as a break-fix technical services manager doing the same type of basic 'break-fix' hardware repair work that Dunn had performed upon his graduation from college." This argument, however, focuses on Beckman's responsibilities for BU when she first started working there--upon, and even prior to, <u>her</u> graduation from college[3]--to the exclusion of the additional responsibilities she took on as she was promoted to manager of technical services, in 2006, and manager of desktop services-central support, in February 2010.

Moreover, while performing those jobs, Beckman developed the "history and performance of actively managing a support group" and "knowledge of service management systems," including ticketing systems, that Gianoulis, in recommending Beckman to be manager of

---

[3]Dunn denigrates the jobs that Beckman held prior to working at BU as "a waitress at a country club, a clerk in a liquor store, and as a development associate at [her college] seeking donations from alumni." We fail to see how the jobs that Beckman held prior to working at BU (when, again, she was still in college) cast doubt on her qualifications to assume the role of desktop services manager some eight years later. <u>Cf.</u> <u>Somers</u> v. <u>Converged Access, Inc.</u>, 911 N.E.2d 739, 752 (Mass. 2009) (reasoning that differences in employee's college experiences are insufficient to establish differences in their qualifications "when many years have passed since their graduation and each had substantial work experience" in the relevant field).

desktop services, had identified as important to the position.[4] Indeed, as Gianoulis later explained, Beckman "was already doing the role" of desktop services manager during her stint as central support manager, where she "provided desktop support to students, staff and faculty . . . in a high volume environment." Dunn, in his role as field support manager, had been providing those services to a more limited client base and, in any event, had specifically told Gianoulis that "he wasn't interested in desktop support."[5]

Based on these undisputed facts, no reasonable jury could find, as Dunn urges, that "the stark disparity in [his] credentials and Beckman's credentials was so manifest that the <u>only</u> way Beckman could have been selected for the [manager of desktop services] job was if age played an impermissible role." As this court has

---

[4]Dunn asserts that Beckman's "use of a ticketing system was limited to basic tracking of orders . . . and not a sophisticated enterprise-level, large scale IT service management model." But that assertion finds no support in the record. Dunn relies solely upon the deposition testimony of Rosman (his former boss in the distributed computing group) as to the type of ticketing system that Rosman "would think" or "imagine" was in use in the BU computer store during Beckman's time there. Speculation, of course, is of no use on summary judgment, see, e.g., <u>Rivera Colón v. Mills</u>, 635 F.3d 9, 12 (1st Cir. 2011), and, in any event, Rosman's testimony--like Dunn's argument in general--speaks only to Beckman's time at the computer store.

[5]Dunn says in his reply brief that he "disputes" having said that, but does not point to anything of evidentiary quality (e.g., his own testimony denying Gianoulis's account). "[A] party may not generate a trial-worthy dispute at summary judgment merely by presenting unsubstantiated allegations in its memoranda." <u>Nieves v. Univ. of P.R.</u>, 7 F.3d 270, 280 (1st Cir. 1993).

instructed, a plaintiff cannot make pretext a trialworthy issue by "essentially relying on his personal belief that he was more qualified" for a job that his employer gave to someone outside of the protected class. <u>Vega-Colon</u> v. <u>Wyeth Pharms.</u>, 625 F.3d 22, 28 (1st Cir. 2010) (citing <u>Shorette</u> v. <u>Rite Aid of Me., Inc.</u>, 155 F.3d 8, 15 (1st Cir. 1998)); <u>see also</u> <u>Somers</u>, 911 N.E.2d at 752 (ruling that plaintiff could not demonstrate pretext for the defendant's hiring decision simply by "pointing to his resume and claiming that he had similar experience" to the non-protected employee who was hired).

Second, Dunn relies on the fact that "Schroeder and Gianoulis deviated from the standard application of University hiring policies and procedures" in selecting Beckman to be the manager of desktop services. As Dunn points out, this court has recognized that "[d]eviation from established policy or practice may be evidence of pretext." <u>Brennan</u> v. <u>GTE Gov't Sys. Corp.</u>, 150 F.3d 21, 29 (1st Cir. 1998) (applying both federal and Massachusetts age discrimination law).

So far as we can tell, however, the only "deviation from established policy" that happened in this case was that the job description for the manager of desktop services position was never posted in the university job listings.[6] And we simply cannot see

_____

[6]Dunn also emphasizes that Schroeder and Gianoulis did not "review any resumes" or "conduct any interviews," but he points to nothing in the record suggesting that BU had any policy imposing

-21-

any logical connection between that omission and the question before us, i.e., whether a rational jury could find that BU's stated reasons for giving the job to Beckman rather than to Dunn are in fact pretext for discriminating against Dunn on account of his age. Cf. Vega-Colon, 625 F.3d at 28 (observing that the "inner workings" of defendant's hiring process "are not relevant, so long as [plaintiff's] status was not a motivating or substantial factor in [the] decision not to hire him").

Dunn offers only that "a reasonable jury could infer that [his] supervisors did not follow through with established hiring procedures because they knew that Beckman would not be qualified for the job." Insofar as this assertion does not simply rehash Dunn's attack on Beckman's qualifications, it fails to explain how following "established hiring procedures" would have thwarted the plan to give the manager of desktop services job to Beckman. Indeed, the only record evidence on this point is that Gianoulis shared that plan with a representative from the university's human resources department, who voiced "no concerns" with it. More importantly, we fail to see how an attempt to circumvent a job posting procedure in order to hire a supposedly less qualified person suggests ageist motivations, in any event. We are left, then, with the sort of "criticisms of [an employer's] decision

those requirements, particularly when giving a new job to someone who was already working there.

making process" attendant to a reduction-in-force that "fail to reveal any hidden animus" as a matter of Massachusetts law. Sullivan, 825 N.E.2d at 542.

Finally, Dunn relies on "ageist statements by Dunn's supervisors from which a reasonable jury could conclude that [his] age played a role in his termination." In support of this argument, Dunn asserts that "Schroeder and Gianoulis wanted to project a 'new' youthful image from what they viewed as the 'client-facing' portions of the IT Help Center, and to them [Dunn] was purportedly 'resistant' to technological change, not sufficiently forward-looking, and wanted to just 'recreate' the past." The places in the record that Dunn cites in support of this assertion, however, do not support much of it--they contain nothing that could be construed as an expression, or even a betrayal, of any desire to project a "new, youthful image," as to "client-facing portions of the IT Help Center" or otherwise.

It was only in explaining why introducing a ticketing system "was a real uphill battle for [Dunn] and his team" that Gianoulis cited "[r]esistance to change . . . . [T]hey had been doing things a long time along the way without a ticketing system." And it was only in describing his reaction to Dunn's proposal for reorganizing the department that Gianoulis testified that Dunn "wanted to recreate the past. He wanted to go back to the overhead and the structure that we had" (in response to which, Gianoulis

-23-

recalled, he had "told [Dunn] to stop focusing on the past . . . . [T]his is a time of change, you've got to move forward").

Under Massachusetts law, such "[r]emarks that are facially ambiguous and may reflect managerial concerns regarding an employee who declines to adapt to changed business practices, rather than [the manager's] preference for more youthful workers," cannot provide the evidentiary fuel for an age discrimination claim. Sullivan, 825 N.E.2d at 536-37 n.24; see also Thomas v. Sears, Roebuck & Co., 144 F.3d 31, 33-34 & n.1 (1st Cir. 1998) (ruling that supervisor's comments that the plaintiff "had been around too long" and "wasn't able to change," made in response to his "outspoken . . . disagreement with [defendant's] change in business policy," were not "a coded allusion cloaking age discrimination" and thus made "no showing that" the defendant's stated reason for terminating the plaintiff during a restructuring was pretextual under Massachusetts law).

Dunn also heavily relies on his own testimony that Gianoulis, while discussing the creation of a new "service desk manager" position in April 2010, said "he [was] really looking for a younger person in that role." This comment also does not suffice to demonstrate a genuine issue as to whether BU's stated reasons for reassigning the duties of Dunn's job to Beckman as the new manager of desktop services--a position different from the service

desk manager job that Gianoulis was discussing with Dunn[7]--are mere pretext for age discrimination.

As this court has explained, "[w]hile evidence of age-related comments may be sufficient to support an inference of pretext and discriminatory animus" behind a plaintiff's termination, that inference does not follow where the plaintiff "fail[s] to adduce sufficient evidence that the remarks were both temporally and causally related to [the defendant's] decision to discharge him." Melendez v. Autogermana, Inc., 622 F.3d 46, 54 (1st Cir. 2010) (emphasis added). Here, although Gianoulis stated his preference for "a younger person" for the service desk manager job just a few weeks before making the decision to eliminate Dunn's position, Dunn has not pointed to any evidence suggesting that Gianoulis also preferred a "younger person" for the desktop services manager position that he later awarded to Beckman, or even that he preferred younger workers generally.

To the contrary, it is undisputed that, in carrying out the May 2010 reorganization, Gianoulis promoted three employees in their 40s, and retained others who were 56 and 60 years old; Dunn

---

[7]Aside from what appears to be an organizational chart, which is reproduced in print to small to read, Dunn does not point to anything in the record supporting his assertion that these positions "are comparable in terms of seniority." To the contrary, as noted above, Dunn himself testified that the service desk manager position was at a "lesser grade [and] pay" than the job he held prior to his discharge--which, of course, was combined with Beckman's then-existing job to create the manager of desktop services position.

was the only employee over 40 who suffered any adverse consequences in the 2010 reorganization.[8]  So no rational trier of fact could take Gianoulis's statement that he was "looking for someone younger" for the service desk manager position in April 2010 as an indication that his stated reasons for subsequently reassigning Dunn's duties to Beckman and terminating him were pretext for discriminating against Dunn because he was older than 40--when, as part of the same reorganization, all other employees age 40 or older were either retained or promoted.  See Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 55-56 & n.11 (1st Cir. 2008) (rejecting plaintiff's argument that his supervisor's comment reflecting a negative "feeling toward older employees in general" created a triable issue as to pretext, in light of supervisor's promotion of other older employees to similar positions).

**IV.**

For the foregoing reasons, we **affirm** the district court's entry of summary judgment for BU.

---

[8]Dunn asserts that "[a]ll of the new desktop services group employee hires were under the age of 40," citing to what appears to be a spreadsheet listing the names, birth years, dates of hire, and positions of employees in that group as of an unspecified time. While this exhibit indeed shows that all employees hired into the group since March 2009 were under 40, all of them were hired into non-managerial positions, and, moreover, Dunn points to no evidence suggesting that anyone 40 or older even applied for any of those jobs.  By itself, then (which is how Dunn has presented it), the list fails to provide any support for Dunn's age discrimination claim.  See Woodward, 714 F.3d at 639-40

-26-