# United States Court of Appeals
## For the First Circuit

No. 20-1434

GERALD ALSTON,

Plaintiff, Appellant,

v.

TOWN OF BROOKLINE ET AL.,

Defendants, Appellees,

JESSE MERMELL, in her individual and official capacities,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch and Selya, Circuit Judges,
and Laplante,* District Judge.

Brooks A. Ames, with whom Brookline Justice League was on brief, for appellant.
Sophia Hall, Robyn Maguire, Alison Casey, and Nutter McClennen & Fish LLP on brief for Lawyers for Civil Rights, The Boston Society of Vulcans of Massachusetts, and The Charles Hamilton Houston Institute for Race and Justice, amici curiae.
Joseph A. Padolsky, with whom Patricia Correa, Douglas I. Louison, and Louison, Costello, Condon & Pfaff, LLP were on brief, for appellees.

---

* Of the District of New Hampshire, sitting by designation.

May 7, 2021

**SELYA**, **Circuit Judge**. A voicemail message, containing a crude and highly charged racial slur, sparked a controversy that rocked the tony town of Brookline, Massachusetts (the Town). On December 1, 2015, the controversy spilled over into the federal district court: plaintiff-appellant Gerald Alston, the recipient of the voicemail message, filed this civil rights action alleging violations of 42 U.S.C. §§ 1981, 1983, and 1985. The operative complaint named a long list of defendants, including (as relevant here) the Town, the Brookline Board of Selectmen (the Board), the Town's counsel and human resources director, and select members of the Board (Nancy Daly, Betsy DeWitt, Ben Franco, Kenneth Goldstein, Bernard Greene, Nancy Heller, Jesse Mermell, and Neil Wishinsky).[1] All of the individual defendants were sued in both their personal and official capacities.

---

[1] Alston also named Stanley Spiegel, a Town Meeting member, and Local 950, International Association of Firefighters (the Union) as defendants. The district court dismissed the claims against Spiegel with prejudice. See Alston v. Town of Brookline, No. 15-13987, 2017 WL 1536213, at *1 (D. Mass. Apr. 26, 2017). The court later entered summary judgment in favor of the Union. Alston v. Town of Brookline, No. 15-13987, 2020 WL 1615408, at *5 (D. Mass. Apr. 2, 2020).

Alston appealed both of these orders. We recently affirmed the order of dismissal as to Spiegel. See Alston v. Spiegel, 988 F.3d 564, 569 (1st Cir. 2021) [No. 20-1434, slip op. at 3]. Alston's claims against the Union, which raise a distinct set of issues, will be resolved in a separate and subsequent opinion. See, e.g., United States v. Santiago-Rivera, 744 F.3d 229, 231 n.1 (1st Cir. 2014).

The defendants denied liability and — following discovery, the dismissal of the claims against Mermell, and other pretrial skirmishing — moved for summary judgment. The district court granted their motions. See Alston v. Town of Brookline, No. 15-13987, 2020 WL 1649915, at *5 (D. Mass. Apr. 2, 2020). This timely appeal ensued.

We previously noted that, due to the complexity of Alston's appeal, we would resolve it in a series of separate opinions. See Alston v. Spiegel, 988 F.3d 566, 569 n.1 (1st Cir. 2021). In this opinion, we address the appeal only insofar as it relates to the district court's grant of summary judgment in favor of the above-enumerated defendants. For the reasons discussed below, we affirm in part, vacate in part, and remand for further proceedings. Withal, we retain appellate jurisdiction over those aspects of the appeal not yet adjudicated.

## I. BACKGROUND

We draw a representative sampling of the facts from the amplitudinous summary judgment record. Alston, a black man, began working for the Brookline Fire Department (the Department) in 2002 as a firefighter. During the spring of 2010, he sustained a work-related injury that temporarily put him out of work. On May 30, 2010, Paul Pender, then a lieutenant in the Department and Alston's supervisor, called Alston to check on his well-being. When Alston did not pick up the telephone, Pender left a voicemail, which

concluded with Pender using a racial slur ("f.....g n....r"), apparently in reference to Alston.

Unsure about how to proceed, Alston sought the advice of senior firefighters. He also played the voicemail for the Department's chief of operations, Michael O'Reilly. O'Reilly did not report the incident to the then-Chief of the Department (Peter Skerry) but instead agreed with Alston that Alston would speak with Pender directly.

Before Alston could reach out to Pender, Pender learned through another firefighter that Alston had told O'Reilly about the voicemail. On July 8, 2010, Pender called Alston and assured him that the racial slur was not intended for Alston. Rather, it was intended for "a young black gang-banger" who had cut off Pender in traffic. Offended by Pender's explanation, Alston abruptly ended the call.

The next time Alston spoke to Pender was on July 10, 2010. Pender again tried to explain the context in which he had uttered the racist comment. He added that reporting the voicemail to O'Reilly "was the stupidest thing [Alston] could have ever done." He then asked Alston, "Are you after my job or something?"

Alston filed a written complaint with Chief Skerry on July 28, 2010. At a meeting two days later attended by Alston, his wife, Skerry, O'Reilly, and then-Town counsel Jennifer Depazo, Alston played the voicemail. In response, Skerry determined that

Pender's language constituted a fireable offense and informed Alston that he would advocate for Pender's termination. Alston replied that he did not want Pender to lose his job. Later that day, Skerry transferred Pender to another station.

In August of 2010, the Board met to discuss possible disciplinary action vis-à-vis Pender. Chief Skerry initially recommended a suspension of four tours of duty for Pender, but the Board rejected that recommendation and imposed a negotiated two-tour suspension. This decision took into account Pender's prior record at the Department and his expression of remorse. Along with the suspension, Pender made certain other concessions: he waived his right of appeal, committed to undergo anger management and diversity training and mediation with Alston, and consented to permanently transfer out of the station where Alston worked. Alston was not called as a witness before the Board.

Roughly two weeks after the effective date of Pender's suspension, the Town promoted Pender to temporary fire captain. In doing so, the Town used Pender's greater seniority to break a tie with another firefighter, citing past practice.

On September 17, 2010 (in anticipation of Alston's post-injury return to work), Chief Skerry met with the Department's officers. He reminded them that the Town has zero tolerance for either discrimination or retaliation.

A week after that meeting, Pender was given a medal at the White House for his heroism in connection with a 2008 fire. Two days after Alston's return to work, Joe Canney, a fellow firefighter, wrote (on a password-protected union blog to which only union members had access) about a "faceless coward" who was marring Pender's receipt of the award. Inferring that Canney was speaking about him, Alston complained to Skerry, who said that he would request deletion of the post. The post was subsequently deleted.

In October of 2010, Alston told Skerry that he was disappointed with the Town's coddling of Pender. In response, Skerry wrote to Alston, suggesting that he seek mental health counseling. On October 14, Alston began seeing a counselor, and he was subsequently excused from work for days at a time for evaluation and treatment of workplace stress. On November 24, Alston became agitated at work as a result of a "routine scheduling decision." Taken to a local hospital, he tested positive for cocaine.

Alston has presented evidence showing that, in February of 2011, Pender again berated him for reporting the voicemail. Pender allegedly told Alston that he had "destroyed [Pender's] life and ruined [Pender's] career."

Chief Skerry retired later that year, and the Board appointed Paul Ford as the new Chief. In early 2012, Ford met

with Alston to talk about how things were between Alston and Pender. Alston told Ford that he wanted to move on from the voicemail incident but that Pender refused even to shake his hand.

Alston was injured in a motor vehicle accident in May of 2012. That month, Alston filed a discrimination charge with the Massachusetts Commission Against Discrimination (MCAD). In November of 2012, he amended the charge to incorporate a claim for retaliation. Specifically, he alleged that he had been "shunned, isolated, and mocked by his fellow firefighters at the direction and instruction of his superiors," that these conditions had been worsening over the past three years, and that he had repeatedly complained about his plight without any intervention by management. Spurred by Alston's charge, the Town human resources director, Sandra DeBow, launched an investigation and concluded that Alston's allegations were without merit.

On May 1, 2013, Chief Ford recommended Pender's permanent promotion. The Board acquiesced, making permanent Pender's promotion to captain. By the time of this promotion, Alston had noticed that firefighters were shunning him, ignoring him, leaving the common areas as soon as he entered, and leaving him out of family social events (to which he previously had been invited). Alston has also presented evidence showing that Pender used his new position to tell recruits that Alston's lawsuit was "a bunch of lies." Pender's account is different: he testified

that he talked with five recruits "who were all minorities" and that all of them were "shocked . . . that something so benign is going on seven and a half years later."

On June 17, 2013, Alston filed suit on his MCAD charge in the state superior court. Two days later, a Town human resources official, Leslea Noble, notified Alston that she wished to interview him about complaints that he had voiced to coworkers. Alston did not respond. When Alston's state-court suit became public, the Town's counsel, Joslin Murphy, reminded Pender of his non-retaliation obligations.

In September of 2013, one of the selectwomen, Nancy Daly, circulated a letter from a retired black firefighter. The letter criticized Alston and asserted that it was insulting to all firefighters for Alston to claim that he could not count on fellow firefighters to save him in a life-threatening situation.

It is undisputed that Alston and Pender had a conversation on October 31, 2013. Viewing that incident in the light most favorable to Alston, see Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999), he approached Pender, saying that his lawsuit was not personal and had nothing to do with Pender. The lawsuit, he said, was about the Town respecting him. Pender again apologized for the voicemail message but then admonished Alston, stating that the lawsuit was dragging his name through the mud and causing pain to his family. Pender

also repeatedly declared that the allegations in the complaint were lies.

At the end of his shift on December 19, 2013, Alston found the word "Leave" written in the dust on the door next to the seat on the firetruck to which he had been assigned. He called this display to the attention of two coworkers, Ryan Monahan and Cormac Dowling. Chief Ford was informed of the incident, and he reported it to both DeBow and Murphy. Three days later, Alston referred to the incident in front of coworkers and stated that, "people go postal over matters like this." That night, Ford interviewed Alston about his statement and — concerned about Alston's mental state — placed him on paid leave pending a psychiatric evaluation. From that point forward, Alston never resumed work as a firefighter.

Ford immediately arranged to meet with DeBow and Murphy, relating that Alston had spoken to him about the incident in a "cordial and calm manner." In his view, Alston was not a threat to his coworkers. He therefore opposed the issuance of a "stay-away order" against Alston. Consistent with Ford's position, both Monahan and Dowling said that they did not feel threatened by Alston's comment. Another firefighter recalled Alston saying that he was not the type of person who would carry out a workplace shooting.

- 10 -

Yet, Chief Ford did not have the last word: on December 27, acting at the direction of the Town's hierarchs, he ordered Alston to stay off the Town's property due to the "going postal" comment. Alston's later attempt to make clear that he had never made a comment about shooting the men in the station fell on deaf ears.

The Town soon circulated a flyer to its police officers. The flyer included a color photograph of Alston and the type of car he drove, listing his name, address, date of birth, and height. It claimed that Alston had "made statements referring to 'going postal,' obtaining a firearm and returning to a firehouse to cause harm." There is no evidence in the record to substantiate the allegations in the flyer beyond the "going postal" comment.

On January 6, 2014, Alston was examined by a psychiatrist chosen by the Town (Dr. Andrew Brown). Dr. Brown lost little time in communicating to Chief Ford and DeBow that Alston did not pose a threat to himself or others.

On January 13, DeBow notified Alston that she was investigating both the "Leave" incident and the "going postal" comment as possible violations of Town policies. She also confirmed that he had been placed on paid leave pending completion of those investigations. She requested that Alston contact her to arrange an interview, but Alston did not respond. At the same time, DeBow requested additional pictures of the "Leave" message

because the picture Alston had submitted reflected glare that "obscured some of the letters" and, thus, complicated any handwriting analysis. Alston did not comply and — on May 14 — DeBow reported that she could not conclude that the "Leave" message was discriminatory or retaliatory because the Town's handwriting expert could not identify the author. DeBow also speculated that a nearby fraternity might have written the message; although "there [was] no evidence to establish that this [fraternity] scenario" occurred, the "possibility [could not] be discounted."

That same day, the Town nonetheless suspended Alston for two tours for violating its workplace safety policy. It also removed him from paid administrative leave and placed him on paid sick leave. Alston's placement on sick leave stemmed from concerns about his mental health. Both Dr. Brown and Alston's own psychiatrist (Dr. Michael Kahn) worried that Alston might not be mentally fit to perform his firefighter duties. In the end, Alston's eventual return to work was conditioned on receipt of appropriate mental health treatment, reevaluation by the Town's psychiatrist, and random drug testing.

On October 23, the Town notified Alston that he had exhausted his available leave.[2] Alston was asked to resume

---

[2] Meanwhile, on July 8, the state superior court entered judgment for the Town on Alston's discrimination and retaliation claims, resting its decision on procedural grounds.

contributing his share of his municipal health insurance premiums. Although Alston did not respond to this request, the Town continued to cover Alston's share and his health insurance remained in force.

The Town and the Department attempted to schedule meetings with Alston to explore whether he could return to work with reasonable accommodations. Alston failed to appear for a planned November 10 meeting. When he insisted on bringing members of the public to a November 24 meeting, Ford and DeBow refused to hold the meeting with Alston's guests present. DeBow then wrote to Alston, notifying him of a scheduled reevaluation appointment with Dr. Brown. Alston's counsel replied that Alston would not attend.

Alston then formally asked the Board to review his claims of discrimination and retaliation. The Board's chair (Kenneth Goldstein) replied in December that "[w]e are . . . informed that the supervisor who uttered those words to you and was formally disciplined for the incident offered his apology to you, and has since repeatedly expressed remorse and regret for his conduct." The following month, Alston contacted Goldstein, complaining about an incident involving Stanley Spiegel, a Town Meeting member. See supra note 1. An investigation commissioned by the Town revealed that Spiegel had told an Alston supporter that "he was a Town Meeting member and he knew things the public didn't know [because] Alston won't allow [his personnel file] to be released to the

- 13 -

public."  The Town sought input about this incident from Alston's counsel but received no response.  Eventually, the Town concluded that Spiegel had not violated the Town's anti-discrimination/anti-retaliation policy.

On January 13, 2015, Goldstein and Murphy met with Alston and his counsel.  They again requested that Alston submit to a reevaluation by Dr. Brown.  Alston refused and continued to press for paid leave.  A brouhaha erupted over a statement that Goldstein construed as a threat and that Alston maintained was benign.  The meeting ended without any progress having been made.

In February, Alston sat for a fitness-for-duty examination by Dr. Marilyn Price, a Town-retained psychiatrist (designated as such after Alston had demanded that the Town replace Dr. Brown).  The next day, Alston was placed on paid leave (apparently as a reward for his cooperation).  Dr. Price concluded that Alston could return to work so long as he committed to appropriate treatment and the Town implemented satisfactory stress-reducing accommodations.  She recommended three specific conditions:  that Alston receive appropriate mental health treatment; that Alston undergo random drug screens; and that the Town work with Alston to identify accommodations to reduce his level of stress.  Even so, Alston and the Town failed to agree on a return-to-work plan.

In June of 2015, Alston wrote to the new Board chair (Neil Wishinsky), requesting a one-on-one meeting to discuss the "stalemate." He stated that, although he had "always been willing to play by the rules," the Town was "not agreeing to make changes that will make the fire house safe for [him]." Alston referenced the seminal 2010 voicemail, arguing that the promotion of Pender undermined the Town's professed "zero tolerance" policy toward racism. He concluded by asking for an opportunity to be heard. Murphy — the Town's counsel — responded that she had advised Wishinsky against such a meeting. Alston did not respond to Murphy. Instead, Alston acknowledged receipt of Murphy's message in a letter to the Board. In his letter, Alston declined the Town's back-to-work conditions and again requested a hearing before the Board on his discrimination and retaliation allegations. Once again, it was Murphy who responded to Alston's request. She went on to emphasize the public safety considerations underlying Dr. Price's conditions and asked Alston to provide specific reasons for disregarding those conditions. Murphy received no reply to her letter. In August and September, Chief Ford sought information from Alston about his current mental health treatment. Alston did not respond to either inquiry.

In November, a Town consultant released the results of a "racial climate" review. The review found no significant areas of concern.

In February of 2016, Murphy requested proof of mental health treatment and instructed Alston to appear for a drug test. Alston neither acknowledged Murphy's request nor appeared for the scheduled drug test. On February 16, the Board met and terminated Alston's paid leave for his failure to cooperate with return-to-work conditions.

In March and April, the Town informed Alston that it had retained Charles Walker, a former MCAD chair, to hear Alston's concerns in front of the Board. Alston refused to participate. On May 5, Murphy informed Alston's counsel that Chief Ford was available to discuss reasonable accommodations and sought information about Alston's availability. Once again, Murphy received no response. In late May, Alston exhausted his accrued leave credits.

In June of 2016, Acting Chief Robert Ward recommended Pender for a temporary promotion to deputy fire chief. Pender appeared before the Board, and the Board decided to accept Ward's recommendation, noting that Pender had served out his discipline related to the voicemail incident.

Alston did not respond to a July 21, 2016 letter from DeBow regarding possible modified duty, and he also did not appear for a drug test scheduled for the following August. At the end of August, an outside hearing officer held a pre-termination hearing. Alston chose not to testify, not to call witnesses, and not to

submit any exhibits. The hearing officer found just cause for termination of Alston's employment, and the Board voted to adopt the recommendation and to terminate Alston's employment. Alston appealed his termination to the Massachusetts Civil Service Commission (the Commission), which denied his appeal without holding an evidentiary hearing. In April of 2018, though, the state superior court vacated the Commission's decision and remanded the matter for an evidentiary hearing. Following a ten-day evidentiary hearing, the Commission reversed Alston's ouster in February of 2019 and ordered him reinstated with back pay. In its decision and findings (the D&F), the Commission concluded that the Town's "own actions and inactions were the reasons that made it impossible for Firefighter Alston to return to work, which formed the basis of [the Town's] decision to terminate his employment." The superior court subsequently denied the Town's motion to stay the Commission's order pending the Town's appeal. And in August of 2019, the superior court affirmed the Commission's decision to reinstate Alston. The Town's appeal was rejected by the Massachusetts Supreme Judicial Court on April 27, 2021. See Town of Brookline v. Alston, No. SJC-12974, 2021 WL 1619958, at *1 (Mass. Apr. 27, 2021).

During the latter stages of this jousting, Alston repaired to the federal district court. He brought this suit in December of 2015, and it culminated (as relevant here) in the entry

- 17 -

of the summary judgment order that is now before us.  See Alston, 2020 WL 1649915, at *5.

**II. ANALYSIS**

Alston assigns error to the district court's entry of summary judgment in favor of the Town, the Board, and a cadre of Town officials sued both in their personal and official capacities. He argues that the record, properly configured, raises triable issues of fact as to the discriminatory and retaliatory nature of the defendants' actions.  Alston also challenges the district court's denial of his motion to void — on public policy grounds — settlement agreements that purport to forbid certain individuals from cooperating in the prosecution of Alston's case.

We review a district court's entry of summary judgment de novo.  See Houlton Citizens' Coal., 175 F.3d at 184.  In that process, we evaluate the facts of record in the light most flattering to the nonmovant (here, Alston) and draw all reasonable inferences in that party's favor.  See id.  Summary judgment is appropriate only when the record, read as required, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a); Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009).  The denial of Alston's motion to void the non-cooperation clauses presents a question of contract

- 18 -

enforceability, which engenders de novo review.  See S. Bay Bos. Mgmt. v. Unite Here, Local 26, 587 F.3d 35, 40 (1st Cir. 2009).

## A.  Claim Preclusion.

At the outset, we think it necessary to clarify the scope of the record.  Specifically, the defendants contend that the relevant time frame from which we can pluck facts is limited to the period after the state court's 2014 judgment.  Alston demurs, maintaining that earlier-occurring facts may be employed to support his claims.  Because the resolution of this temporal dispute will shape our subsequent analysis, we tackle it first.

### 1.  The District Court's Treatment of State-Court Proceedings.  On July 8, 2014, the state superior court dismissed with prejudice Alston's 2013 lawsuit "as a sanction for Alston's failure to comply with discovery obligations."  Alston, 2020 WL 1649915, at *1.  Four years later, the district court was tasked with evaluating how — if at all — that state-court judgment affected Alston's federal-court claims.  See Alston v. Town of Brookline, 308 F. Supp. 3d 509, 516 (D. Mass. 2018).  The defendants invoked the doctrine of claim preclusion and "ask[ed] the court to excise the facts alleged in the first case from the present case."  Id. at 552.  Alston objected.

The district court sided with the defendants:  it concluded "that the doctrine of claim preclusion does apply, because the claims at issue could have or should have been brought

- 19 -

in the prior action." Id. at 517. The court then went beyond what the defendants had requested, ruling that Alston could assert only "claims that post-date the final judgment" in the state-court suit. Id.

Alston moved for reconsideration, arguing (among other things) that because his state-court suit named only the Town as a defendant, his claims against the individual defendants could not be precluded. See Alston v. Town of Brookline, No. 15-cv-13987, 2018 WL 3302995, at *1 (D. Mass. July 5, 2018). The district court denied Alston's motion, holding that "Alston may only assert claims against the defendants — both Town and individual — that have arisen after the date of the final judgment of the [state-court] case." Id. at *2.

The effect of these orders on Alston's claims is not entirely clear. On the one hand, the district court did not explicitly expunge events prior to the 2014 judgment from the record (as requested by the defendants) but, rather, focused its order on "claims" that "could have or should have been brought." Alston, 308 F. Supp. 3d at 517. Under this framework, mixed claims (that is, claims anchored both in facts occurring prior to the 2014 cutoff date and in facts occurring thereafter) arguably could not have been brought in the state-court action and, thus, may have survived. On the other hand, the district court did explicitly "[sustain] the defendant's objection" — an objection

that requested the court to bar all claims "alleg[ing] facts that pre-date the termination" of the state-court suit. Id. at 516-17. Strengthening this implication, the district court later wrote that because "Alston was foreclosed from asserting in this case claims that were or were available to be asserted in the prior case," he could not "assert any claim arising from" incidents that occurred before the state court disposed of his original suit. Alston, 2020 WL 1649915, at *4 n.5. Illustrating this point, the district court noted that the "Leave" incident had occurred in 2013 and, thus, could not be relied upon in the federal-court action. See id.

Claim preclusion is strong medicine and should not casually be dispensed. Although the district court suggested in dictum that its disposition of the case would not be different even if its claim preclusion ruling "was erroneous," id., we are not so sanguine. The scope and validity of this ruling plainly affects the contours of the summary judgment record. Thus, we train the lens of our inquiry on that ruling, reviewing it de novo. See Silva v. City of New Bedford, 660 F.3d 76, 78 (1st Cir. 2011).

**2. Why the District Court Erred**. We apply Massachusetts law to determine the preclusive effect of the state-court judgment. See Torromeo v. Town of Fremont, 438 F.3d 113, 115-16 (1st Cir. 2006). In Massachusetts, "[c]laim preclusion makes a valid, final judgment conclusive on the parties and their privies, and prevents

relitigation of all matters that were or could have been adjudicated in the action." Kobrin v. Bd. of Regist. in Med., 832 N.E.2d 628, 634 (Mass. 2005) (quoting O'Neill v. City Manager of Cambridge, 700 N.E.2d 530, 532 (Mass. 1998)). In the circumstances at hand, claims based entirely on events preceding the state-court judgment could have been adjudicated in state court and are therefore barred. See id.; see also Heacock v. Heacock, 520 N.E.2d 151, 153 (Mass. 1988). For claim preclusion to attach as to mixed claims, the defendants must establish that the prior judgment is one on the merits, that the parties to the prior and present suits are the same or in privity, and that the causes of action stated in the prior and present suits are the same. See Kobrin, 832 N.E.2d at 634.

It cannot be gainsaid that the defendants have satisfied the first element. The state court's dismissal with prejudice of Alston's suit operated as a final adjudication on the merits. See Dep't of Revenue v. LaFratta, 562 N.E.2d 1352, 1355 (Mass. 1990) (explaining that "a dismissal with prejudice 'constitutes an adjudication on the merits as fully and completely as if the order had been entered after trial'" (quoting Boyd v. Jamaica Plain Coop. Bank, 386 N.E.2d 775, 778 n.8 (Mass. App. Ct. 1979))); see also Mass. R. Civ. P. 41(b)(2)-(3) ("On motion of the defendant, . . . the court may, in its discretion, dismiss any action for failure of the plaintiff to prosecute or to comply with these rules

- 22 -

or any order of court. . . . [Such] a dismissal . . . operates as an adjudication upon the merits.").

The defendants' smooth sailing stops there. For one thing, they encounter rough seas when the identity-of-parties element is inspected. In the state court, Alston sued the Town alone. By contrast, Alston's federal-court suit is directed not only against the Town but also against a bevy of individual defendants affiliated with the Town (who are named in both their individual and official capacities). As official-capacity defendants, these individuals present no barrier to the application of claim preclusion: we have held that "a public official, sued only in his official capacity, is a proxy for the government entity that employs him and is in privity with that entity." Goldstein v. Galvin, 719 F.3d 16, 23 (1st Cir. 2013). For claim preclusion purposes, then, the identity-of-parties element is satisfied as to the claims against the Town and the individual defendants in their official capacities.

But as individual-capacity defendants, these Town officials stand on a different footing. Because "[b]y definition, such a suit takes aim at the individual," those individual-capacity defendants are "not considered to be in privity with the government entity" with which they are affiliated (here, the Town). Id. Building on this foundation, we held in Goldstein that "a person who is sued in one capacity (whether official or individual) cannot

assert a defense of claim preclusion in a later action in which he is sued in a different capacity." Id. Thus, "a person who has defended a suit brought against him in his official capacity is not protected by principles of claim preclusion from a subsequent suit brought against him by the same plaintiff[] in his individual capacity." Id. It follows that none of Alston's claims against persons sued in their individual capacities are subject to claim preclusion, and the district court's contrary ruling was incorrect.

The defendants challenge this conclusion arguing that the "operative holding" in Goldstein was too narrow to be helpful. As they read it, Goldstein stands only for the proposition that "when a federal court considers the preclusive effect of an earlier state-court judgment, it must apply that state's preclusion principles." And in Massachusetts, they say, those principles demand a finding of claim preclusion.

The defendants read Goldstein too grudgingly. There, we assessed the preclusive effect of a state-court judgment when the state-court suit was against an individual in his official capacity and the subsequent federal suit named him only in his individual capacity. See id. at 22-23. We concluded "that an official who has litigated [a claim] in his official capacity is not precluded from relitigation [of that claim] in his personal capacity." Id. at 23 (internal quotations omitted). This conclusion is the law

of this circuit and, as such, it is binding upon us. See United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018); Nevor v. Moneypenny Holdings, LLC, 842 F.3d 113, 125 (1st Cir. 2016).

The individual defendants also suggest that Goldstein misconstrued Massachusetts law. Even if that question were open to us — and it is not — the defendants do not argue that the wall that Goldstein erected between a defendant's official and individual capacities does not exist. Instead, they argue, in effect, that our conclusion in Goldstein was erroneous because, under Massachusetts preclusion principles, state courts do not require a showing of the identity of the parties. Massachusetts courts, the defendants assert, apply the doctrine of non-mutual claim preclusion, which permits a person who was not a party in a prior suit to raise the defense of claim preclusion in a subsequent suit (such that litigation of a claim in one capacity may preclude relitigation in another capacity).

The cases that the defendants cite for this suggestion are not in point. Some of them do not apply Massachusetts law. See, e.g., Fidler v. E.M. Parker Co., 476 N.E.2d 595, 599-600 (Mass. 1985) (determining preclusive effect of earlier federal-court judgment under federal claim-preclusion principles); Mancuso v. Kinchla, 806 N.E.2d 427, 434 (Mass. App. Ct. 2004) (same). Others turn on issue preclusion, not claim preclusion, see, e.g., Martin v. Ring, 514 N.E.2d 663, 664 (Mass. 1987); Maher v. General

Motors Corp., 346 N.E.2d 833, 835 (Mass. 1976); Home Owners Fed. Sav. & Loan Ass'n v. Nw. Fire & Marine Ins. Co., 238 N.E.2d 55, 59 (Mass. 1968), and this distinction makes a dispositive difference, see TLT Constr. Corp. v. A. Anthony Tappe & Assocs., Inc., 716 N.E.2d 1044, 1049 (Mass. App. Ct. 1999) ("Claim preclusion has as a prerequisite that there be an identity or privity of the parties to the present and prior actions, while issue preclusion requires [only] that the party against whom issue preclusion is asserted in the present action was a party or in privity with a party to the prior adjudication."). The rest of the cases that the defendants cite describe claim preclusion generally but wholly fail to establish that, under Massachusetts law, a defendant who was neither a party nor in privity with a party in the earlier suit may invoke claim preclusion against a plaintiff. See, e.g., O'Neill, 700 N.E.2d at 532; Heacock, 520 N.E.2d at 152-53.

We need not paint the lily. Consistent with Goldstein, we hold that for a claim to be precluded by a previous state-court judgment, Massachusetts law requires the identity of parties. See Korbin, 832 N.E.2d at 634. The defendants sued in this action in their individual capacities were neither parties to Alston's state-court suit nor in privity with such parties. Accordingly, Alston's claims against those individual-capacity defendants are not subject to claim preclusion.

This leaves the possibility of claim preclusion against the Town and the individual defendants in their official capacities. That possibility hinges on the third element of the claim preclusion framework: the identity of the claims. We bring that element front and center.

Under Massachusetts law, "[a] claim is the same for [claim preclusion] purposes if it is derived from the same transaction or series of connected transactions." Saint Louis v. Baystate Med. Ctr., Inc., 568 N.E.2d 1181, 1185 (Mass. App. Ct. 1991). Several of the events important to Alston's federal-court claims undergirded Alston's state-court claims. In the state-court suit, Alston pleaded discrimination and retaliation claims and supported those claims with descriptions of the 2010 voicemail incident, Pender's subsequent promotions, and allegations that the Department's brass and the Town not only failed to take corrective action but also participated in further violations of his rights. Those allegations focused on the Town's actions aimed at isolating Alston from fellow firefighters. Alston says that the Town mocked him by calling discrimination trainings "Alston trainings" or "Gerald trainings," by instructing other firefighters to "stay away from Alston" lest they risk being sued or fired, and by foot-dragging with respect to injured-on-duty benefits after Alston had been hurt at work. According to Alston, the Town's actions resulted in firefighters shunning and ridiculing him.

Alston's allegations in federal court sweep much more broadly than his allegations in state court. As an example, they go well beyond his relationship with his fellow firefighters. Alston alleges that the Town spoke to outside sources in order to discredit him, that the selectmen engaged Alston in bad faith after they placed him on paid administrative leave in February of 2015, and that the selectmen's insincere efforts to ensure that Alston would feel safe at work culminated in the termination of Alston's paid leave in February of 2016. As another example, Alston alleges in his federal-court suit that he was fired for discriminatory and/or retaliatory reasons — but that firing did not take place until well after 2014, and Alston's federal-court allegations are considerably more extensive than his state-court allegations of workplace disruption. Where, as here, subsequent conduct is materially more extensive than the conduct underlying an earlier suit, claim preclusion will not lie. See Walsh v. Int'l Longshoremen's Ass'n, Local 799, 630 F.2d 864, 873 (1st Cir. 1980).

The sockdolager is that many of the allegations in Alston's federal-court complaint post-date the state-court judgment. For instance, the operative version of the federal-court complaint alleges that the state-court judgment itself triggered further retaliation by the defendants because the state-court suit was (in their view) Alston's "last protection against termination." Thereafter, Alston alleges, the Town ignored him,

cut off his pay, spoke negatively about him in public, and then cashiered him. None of these allegations could conceivably have been included in the state-court suit because they refer to events that had not then happened. Put another way, the present allegations "involve subsequent conduct, and thus lack sufficient identicality of causes of action with the earlier suit." González-Piña v. Rodríguez, 407 F.3d 425, 430 (1st Cir. 2005) (finding that claim preclusion did not apply where employee who returned to work after first suit was subjected to new conduct) (internal quotations omitted).

The bottom line is that Alston's suspension without pay and his subsequent firing go significantly beyond the nucleus of operative facts alleged in the state-court case, both in time and scope. And because suspension without pay and firing are alleged to be retaliatory consequences that were not — and could not have been — set out in the state-court complaint, the suit before us does not "seek[] redress for the same wrong[s]." TLT Constr. Corp., 716 N.E.2d at 1051 (quoting Mackintosh v. Chambers, 190 N.E. 38, 39 (Mass. 1934)). Therefore, the claims involved in the two suits are not identical.

Against this backdrop, we hold that Alston's present claims against the Town and the official capacity defendants are

not precluded by the state-court judgment.  To the extent that the district court held to the contrary, its holding was in error.[3]

**3.  Some Final Words**.  The doctrine of claim preclusion sieves claims, not facts.  See Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2305 (2016).  Nor are we aware of any other authority that would bar the consideration of facts that occurred before the state-court judgment.  See id. (citing Restatement of Judgments for proposition that materially changed circumstances post-judgment, "taken in conjunction with the antecedent facts," may form the nucleus of a second action, Restatement (Second) of Judgments § 24, cmt. f (1980)).  In this suit, Alston complains of conduct that transpired over many years.  We conclude that he is not precluded either from bringing the present claims or from supporting those claims with facts that pre-date the state-court judgment.  To the extent that the district court's rulings contravened these principles, those rulings were incorrect.

---

[3] There is one exception. Alston's claims against Selectwoman Mermell did not make it to the summary judgment stage.  The district court dismissed those claims because Mermell left the Board in 2013 and, as a result, no claim against her rested on facts that post-dated the state court's 2014 judgment. See Alston, 2018 WL 3302995, at *2 n.1.  Mermell is not listed on the docket as an appellee, and Alston offers no arguments against her on appeal.  What is more, when listing "the town officials who condoned and participated in the discrimination and retaliation" against him, he includes each of the individual defendants except Mermell.  Accordingly, the district court's decision to dismiss the claims against her has not been challenged, and we need not consider it.

These errors have significant ramifications for this appeal. The appropriateness of summary judgment depends, of course, on the existence vel non of genuine issues of material fact. The district court's erroneous view of claim preclusion artificially constrained the sources that it was willing to consider in determining whether genuine issues of material fact existed. We must proceed, therefore, to evaluate Alston's remaining claims of error against the full summary judgment record — a tableau that includes facts that occurred prior to the entry of the 2014 state-court judgment. We turn next to that task.

**B. <u>Claims Against the Town and the Board (count 1)</u>.**[4]

Alston alleges that the Town and the Board are liable for racial discrimination against him in violation of the Equal Protection Clause. <u>See</u> U.S. Const. amend. XIV, § 1. He also alleges that the Town retaliated against him for protesting this discriminatory treatment, thereby abridging his First Amendment right to free speech. <u>See</u> U.S. Const. amend. I. These wrongs, he says, entitle him to recover damages under 42 U.S.C. §§ 1981 and 1983. We examine his claims sequentially.

---

[4] Count 1 also contains allegations against Murphy and DeBow, but nearly identical allegations are contained in count 2. With respect to Murphy and DeBow, Alston's briefing does not distinguish between counts 1 and 2 but, instead, refers generally to those counts as his "discrimination and retaliation claims." For ease in exposition, we examine all of his claims against Murphy and DeBow in our subsequent discussion of count 2.

**1. Equal Protection**.  Alston invokes section 1983, asserting that the defendants violated his equal protection rights.[5]  See Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008) ("Section 1983 is a vehicle through which individuals may sue certain persons for depriving them of federally assured rights.").  To succeed on an equal protection claim, Alston must establish that, compared with others similarly situated, he was treated selectively and in a subpar manner based on impermissible considerations (such as race).  See Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995); see also Ayala-Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 32 (1st. Cir. 2012) ("Some evidence of actual disparate treatment is a 'threshold requirement' of a valid equal protection claim" (quoting Est. of Bennett v. Wainwright, 548 F.3d 155, 167 (1st Cir. 2008).).  "To

---

[5]  At the motion-to-dismiss stage, the district court considered whether the allegations in the operative complaint sufficed to establish municipal liability under section 1983.  See Alston, 308 F. Supp. 3d at 532-34; see also Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978).  At that time, the Town and the Board conceded that the Board members were the final policymakers for purposes of liability anent Alston's employment.  Alston, 308 F. Supp. 3d at 534.  For that reason, the district court concluded that the allegations that the Board members' conduct "deprived Alston of constitutional rights is an acceptable method of establishing municipal liability under § 1983."  Id.; see also Welch v. Ciampa, 542 F.3d 927, 942 (1st Cir. 2008) ("[A] single decision by a final policymaker can result in municipal liability.").  On appeal, the defendants do not dispute that Alston's allegations, if proven, would suffice to establish municipal liability.  Accordingly, no Monell issue is before us.

put flesh upon the bare bones of this theory," a plaintiff's task is "to identify and relate specific instances where persons situated similarly 'in all relevant aspects' were treated differently." Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989) (quoting Smith v. Monsanto Chem. Co., 770 F.2d 719, 723 (8th Cir. 1985)). Such relevant aspects include job "performance, qualifications and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations." Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

Alston has failed to satisfy this obligation. He neither alleges nor points to facts that identify non-black firefighters similarly situated to him, who did not experience the negative treatment and adverse employment actions to which he was subjected. Cf. Ayala-Sepúlveda, 671 F.3d at 32 (granting summary judgment when plaintiff, a homosexual man, "present[ed] no evidence regarding, for example, instances in which heterosexual employees with similar rank and qualifications were not transferred"). In his briefing, Alston does not make the slightest effort to identify any facts in the record that might show such a disparity in treatment. We have warned before — and today reaffirm — that "a litigant has an obligation 'to spell out [his] arguments squarely and distinctly,' or else forever hold [his] peace." Rivera-Gomez

v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) (quoting Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988)).  So it is here.  Consequently, we hold that the district court's grant of summary judgment on Alston's equal protection claim was unimpugnable.[6]  See Ayala-Sepúlveda, 671 F.3d at 32.

    **2.  Section 1981**.  We turn next to Alston's claims under 42 U.S.C. § 1981.  The "exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units" is section 1983.  Buntin v. City of Boston, 857 F.3d 69, 70-71 (1st Cir. 2017) (quoting Jett v. Dallas ISD, 491 U.S. 701, 733 (1989)).  Thus, a plaintiff "may not bring claims for damages under 42 U.S.C. § 1981 against state actors."  Id. at 70.

---

[6] Alston's claims against the individual defendants include claims under 42 U.S.C. § 1983.  As we noted in Spiegel, 988 F.3d at 574, the operative complaint does not explicitly invoke any particular constitutional provision in relation to the individual defendants.  The operative complaint does, however, invoke the Equal Protection Clause, see U.S. Const. amend. XIV, § 1, with respect to Alston's parallel allegations concerning the Town and the Board's allegedly discriminatory conduct.  We therefore assume that his allegations of race discrimination against the individual defendants likewise arise under the Equal Protection Clause.  See Spiegel, 988 F.3d at 574.  So viewed, those claims suffer from the same evidentiary deficiency that dooms his counterpart equal protection claims against the Town and the Board:  they lack any predicate showing of similarly situated firefighters who were spared the same sort of negative treatment and adverse employment actions of which Alston complains.  Thus, we affirm the entry of summary judgment in favor of the individual defendants on these claims.

We are bound by Buntin as the law of the circuit, and Alston does not articulate any legal theory that would suffice to circumvent the Buntin limitation. Accordingly, we affirm the district court's entry of summary judgment in favor of the Town and the Board with respect to Alston's section 1981 claims. By the same token, we affirm the district court's order granting summary judgment in favor of the individual defendants, in both their individual and official capacities, on those claims. See id. at 70, 76. After all, those defendants are also state actors and they are alleged to have acted only within the realm of their official duties. See id. It follows that Alston's section 1981 claims against them are barred.

3. **Section 1983 Retaliation**. This brings us to Alston's claims for retaliation under 42 U.S.C. § 1983. The gravamen of his claims is the contention that the defendants — the Town and the Board — retaliated against him for his exercise of his First Amendment rights. To prevail, Alston — as a public employee — must establish that his expression involved matters of public concern, that his interest in commenting upon those matters outweighed the Town's interests in the efficient performance of its public services, and that his protected speech was a substantial or motivating factor in the adverse employment actions that were visited upon him. See Lewis v. City of Boston, 321 F.3d 207, 218 (1st Cir. 2003). If Alston can make a prima facie showing

to this effect, the burden shifts to the defendants to demonstrate that they would have taken the same action regardless of Alston's speech. See Collazo-Rosado v. Univ. of P.R., 765 F.3d 86, 95 (1st Cir. 2014).

The affected defendants concede that Alston has made out a prima facie case of retaliation. They insist, though, that they cooperated with Alston to facilitate his return to work and relied on Dr. Price's report in deciding to terminate Alston's employment. These actions, they say, make it pellucid that their decision to fire Alston was not anchored in a retaliatory rationale but, rather, that Alston's unfitness for duty was an independent reason for terminating his employment.

In arguing that this explanation is a sham, Alston points primarily to the D&F (the decision and findings of the Massachusetts Civil Service Commission). In the D&F, the Commission found the defendants' proffered reasons for firing Alston to be pretextual. Alston submits that if a jury were presented with the D&F — which rested on evidence that is largely included within the summary judgment record — it could reasonably conclude that the defendants acted in a retaliatory manner. The D&F should have been treated as admissible evidence in this case,

Alston insists, under Federal Rule of Evidence 803(8) and First Circuit precedent interpreting that rule.[7]

Rule 803(8) crafts an exception to the hearsay rule, in certain circumstances and subject to certain conditions, for "factual findings from a legally authorized investigation" by a governmental entity. Fed. R. Evid. 803(8)(A)(iii). Alston argues that the D&F satisfies these criteria and that comparable administrative findings, reached (as here) after adversarial hearings, have been admitted into evidence in other cases. See, e.g., Davignon v. Hodgson, 524 F.3d 91, 113 (1st Cir. 2008) ("The Supreme Court has interpreted [the] 'public records' exception to the hearsay rule broadly to include both conclusions and opinions of public offices and agencies" (quoting Patterson v. Mills, 64 F. App'x. 457, 462 (6th Cir. 2003).)); see also Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 162 (1988).

The defendants' initial objection is that Alston failed to advance this argument below. Specifically, they contend that Alston "did not mention Fed. R. Evid. 803(8) and First Circuit precedent construing it" in the district court and, thus, waived any argument premised on those authorities. The record, however, tells a different tale.

---

[7] Although the amici argued in their brief that the D&F should be accorded preclusive effect, Alston expressly disavows that argument.

It is true that Alston did not make mention of either Rule 803(8) or First Circuit precedent interpreting it. But Alston justified his reliance on the D&F by citing case law for the proposition that the court could take judicial notice of it as a record and report of an administrative body. In addition, Alston argued below that the D&F itself constituted evidence sufficient to convince a reasonable jury to find that the defendants' explanation was a pretext for discriminatory and retaliatory conduct. He pointed out that, because the D&F was itself a product of an extensive evidentiary hearing and because that rational trier of fact found in his favor, a reasonable jury presented with essentially the same information could also find in Alston's favor. And in his opposition to the motion for summary judgment, Alston submitted that "[t]he facts presented at the civil service hearing, and the inferences drawn from those facts, were plainly sufficient to permit a reasonable fact finder — the chair of the Commission — to reject the Town's claim to have terminated Alston in good faith and for non-discriminatory and non-retaliatory reasons." Alston then suggested that "[i]t is not a leap to conclude that a reasonable jury, with the benefit of a full trial, could reject the same defenses proffered by the Defendants in this case. A jury would also be permitted to find, as did the Commission, that Alston's termination was retaliatory . . . on the basis of race."

There was more.  In that same opposition, Alston again argued that "after hearing all the evidence and making appropriate assessments of credibility, the Commission unequivocally rejected the Defendants' version of reality and sided with Alston.  It is simply not credible, therefore, for the Defendants to claim that a reasonable jury would somehow be compelled to find in the Defendants' favor on the same set of facts."

The bottom line is that the defendants were clearly on notice of Alston's argument during the district court proceedings.  In their rejoinder to Alston's opposition to summary judgment, they presented essentially the same arguments that they now make as to the admissibility vel non of the D&F.  Given these back-and-forth volleys, we think it is evident that Alston presented the D&F as a source of material facts for summary judgment purposes.  That is essentially the same argument that he is making to us.

Whether or not an issue is preserved in the trial court does not depend on what authorities the arguing party cites to that court.  See Metavante Corp. v. Emigrant Sav. Bank, 619 F.3d 748, 773 n.20 (7th Cir. 2010) (finding issue preserved because it was raised below and noting that "litigant may cite new authority on appeal"); United States v. Rapone, 131 F.3d 188, 196 (D.C. Cir. 1997) (distinguishing between raising new issue and citing new authority on appeal).  Rather, preservation of the issue depends on whether the issue itself was presented face up and squarely in

the trial court.  See B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 40 (1st Cir. 2004); Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992).  Consistent with these principles, we hold that Alston adequately preserved the issue of whether the D&F should be considered as part of the summary judgment record.

We turn next to the question of how the district court treated the D&F.  Although the court did not explicitly decide whether the D&F was specific and competent evidence, it ruled more globally that Alston "fail[ed] to cite competent, non-conclusory evidence in support of his objections to the defendants' cited factual evidence." Alston, 2020 WL 1649915, at *3.  Later on, the court stated that Alston had not "pointed to admissible evidence that would support a factfinder's conclusion that the Town was punishing him in retaliation for his expressions of criticism." Id. at *5.  The only plausible reading of the district court's rescript is that the court must have decided, sub silentio, to exclude the D&F from the summary judgment record.  We review the district court's decision to exclude the D&F for abuse of discretion.  See Udemba v. Nicoli, 237 F.3d 8, 14 (1st Cir. 2001).

"Abuse-of-discretion review is respectful but appellate deference is not unbridled." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 10 (1st Cir. 2013).  For example, a material error of law

categorically constitutes an abuse of the district court's discretion. See id. Similarly, an abuse of discretion "occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when . . . the court makes a serious mistake in weighing [the relevant factors]." Id. (quoting Indep. Oil and Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988)).

We think that the court below abused its discretion in effectively excluding the D&F. The defendants' argument, in essence, posits that Federal Rule of Civil Procedure 56(c)(1) requires parties to dispute facts in particular ways and that Alston did not refer to the D&F in such a way. Although this argument makes clear that Alston did not dispute many of the statements of fact put forth by the defendants, nothing in Rule 56(c)(1) informs a court about the admissibility of a particular piece of evidence. Indeed, the rule itself contemplates proof of facts through, inter alia, "other materials."[8]

---

[8] Rule 56(c)(1) provides in pertinent part that

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . .

Fed. R. Civ. P. 56(c)(1)(A).

Here, the most logical conclusion that can be drawn from a murky record is that the district court failed to give any weight to a proper factor in the decisional calculus:  the D&F.  The court's only reference to the D&F was its conclusion that the D&F did not work any issue preclusion.  See Alston, 2020 WL 1649915, at *3 n.2.  This conclusion, though, sheds no light on the admissibility of the D&F.  An agency's findings are not inadmissible simply because they have no preclusive effect.  Cf. Davignon, 524 F.3d at 113 (upholding admission of agency decision under Rule 803(8) even though decision "involved a different issue and was not binding on the jury").

To be sure, the Town and the Board argue in their appellate brief that the D&F is shot full of hearsay and is otherwise unreliable.  These arguments are in service to an attempt to lay a foundation for the exclusion of the D&F as untrustworthy under Rule 803(8).  The fly in this particular ointment is that the defendants did not make any of these objections to admissibility below.  Because the issue of whether the D&F should be excluded on this basis was not properly before the district court, we do not decide this issue.  "If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."  Superline

Transp., 953 F.2d at 21. For purposes of this appeal, then, any such objections are by the boards.[9]

We hold that the district court abused its discretion in erroneously excluding the D&F at summary judgment because (the court thought) it lacked preclusive effect. Even so, this holding does not end our inquiry. It remains for us to determine whether a jury, armed with the D&F, reasonably could conclude that the defendants' stated reasons for terminating Alston's employment were pretextual.

In conducting this appraisal, we remain mindful that there is no "mechanical formula" for establishing pretext. Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003). One size does not fit all, and the inquiry into pretext is the kind of inquiry in which "everything depends on the individual facts." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 7 (1st Cir. 2000) (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 58 (1st Cir. 1999)). Consequently, "we have been 'particularly cautious' about taking such questions out of the jury's hands." Che, 342 F.3d at 40 (quoting Hodgens v. Gen.

---

[9] We do not foreclose the possibility that the defendants, in subsequent proceedings before the district court, may seek to carry their burden of showing untrustworthiness and, thus, persuade the district court to exclude all or some of the D&F under Rule 803(8). See United States v. Fuentes-Lopez, ___ F.3d ___, ___ (1st Cir. 2021) [No. 20-1188, slip op. at 8]. That issue is simply not before us.

- 43 -

Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998)); see Petitti v. New Eng. Tel. & Tel. Co., 909 F.2d 28, 34 (1st Cir. 1990) ("This court has consistently held that determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury, as proof is generally based on inferences that must be drawn, rather than on the proverbial 'smoking gun.'" (citation and quotation marks omitted)).

Here, the record — properly constituted — contains an agency decision (the D&F) finding the defendants' reasons for firing Alston to be pretextual. That agency decision tips the summary judgment scales and leads us to conclude that there was sufficient evidence from which a rational jury could find that the defendants' stated reason for firing Alston was only a pretext for discrimination.

In reaching this conclusion, we take note that there are a number of routes through which a plaintiff can demonstrate pretext. One such route is "by showing that the employer's proffered explanation is unworthy of credence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 256 (1981)). Another route allows a plaintiff to demonstrate pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" such that a factfinder could "infer that the employer did not act

for the asserted non-discriminatory reasons." Hodgens, 144 F.3d at 168. As we explain below, Alston's case travels down these routes.

The defendants submit that Alston was fired because he was not fit for duty and because his non-cooperation and refusal to comply with the drug-testing condition rendered him unfit to return to work. Alston says that these reasons were convenient fictions, and several facts (taken in the light most favorable to Alston) combine to support an inference that they were bogus.

To begin, the Commission considered whether the defendants' proffered reasons for the adverse employment action were a "'mere pretext or device to get rid of' [Alston]." It concluded that they were. The D&F described how the conditions that triggered Alston's mental health issues — issues that the Town then used to question Alston's fitness for duty — were caused by the defendants. According to the Commission, the Town "chose not to impose meaningful discipline" on Pender, elected to overlook the shunning and ignoring of Alston by other firefighters, and "promoted a false narrative that painted [Alston] as a paranoid employee who simply couldn't 'move on.'"

The conclusion that the defendants created the conditions that left Alston unfit for duty is not plucked out of thin air but, rather, is bulwarked by other facts in the record. For instance, the information in the flyer describing Alston's

"going postal" comment was exaggerated, and Chief Skerry could not identify the source of the added information.  Moreover, Pender's statement describing new firefighters' surprise at how "something so benign" could be ongoing seven years later, could well suggest to a jury that the defendants have allowed a mischaracterization of the 2010 incident to flourish.

The record facts could also suggest that the defendants were quick to minimize Alston's concerns with workplace hostility — concerns that he communicated to the Town as his reasons for not participating in the scheduled drug-testing.  As an example, DeBow was easily dissuaded, without a shred of proof, from the logical conclusion that the "Leave" message was rooted in discrimination or retaliation.  In marked contrast, she could not dismiss the "possibility" that the message was spawned by a fraternity despite there being absolutely no evidence to that effect.  And, finally, after Mermell left the Board in 2013, she posted a public apology to Alston, in which she lamented voting in favor of Pender's two-week suspension, called his punishment "inadequate," and admitted that she "accepted what [she] was told as fact" and that she failed "to assert that a bare-bones punishment fell short of an appropriate response in the face of one of the most vile slurs."  Mermell added that her failure to object to Pender's temporary promotion was "yet another message regarding the lack of seriousness and full understanding with which the Town leadership

- 46 -

was approaching this matter." All of these events took place prior to Dr. Price's 2015 report and could suggest to a jury that the defendants were unwilling from the very beginning to credit Alston's complaints of race discrimination and hostility, regardless of Alston's fitness to perform his duties as a firefighter.

Last — but surely not least — a jury reasonably could conclude on this record that the defendants' real motives were discriminatory or retaliatory. Although the relevant events spanned many years, the key fact is that the sequence of events was precipitated by a supervisor uttering a vicious racial slur. As the Fourth Circuit observed, "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as [the 'n-word'] by a supervisor in the presence of his subordinates." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) (quoting Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)). So, too, "[n]o other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans." Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring). The record facts, taken in the light most conducive to Alston's claims, support serial conclusions: that the two-week

suspension of Pender was incommensurate with the repugnancy of Pender's language; that Pender's subsequent promotions were inconsistent with the defendants' professed "zero tolerance" policy toward racism; and that, for many years after the seminal incident, the defendants labored to protect — albeit clumsily — the supervisor who was in the wrong by nurturing the narrative that Alston was paranoid while Pender was remorseful. Given the supportability of these conclusions, a jury reasonably could find that when the defendants realized that Alston would not budge, they chose to look for reasons to terminate his employment instead of taking action against Pender.

Drawing all reasonable inferences in favor of Alston, we conclude that a jury could find that Alston's unfitness for duty was not the true reason for his firing. Instead, a jury could find that the true reason for the firing was as a reprisal for Alston's complaints of discrimination and retaliation. Accordingly, we vacate the district court's grant of summary judgment in favor of the Town and the Board on Alston's retaliation claims under section 1983 and remand those claims for further proceedings.

C. **Remaining Claims Against Individual Defendants (count 2)**.

We now reach Alston's remaining claims. The record makes manifest that even though all of the individual defendants may not have been involved in every significant event, each of them was

involved in at least one significant incident — investigating the voicemail fiasco, disciplining Pender, his subsequent promotions, the inquiry into the "Leave" incident, or Alston's firing. Alston's claims against them, brought pursuant to sections 1981 and 1983, allege race-based discrimination and retaliation.[10] We already have disposed of Alston's section 1981 claims and his section 1983 equal protection claims against these defendants, see supra Part II(B)(2) and note 6, and we need not repastinate that well-plowed ground.

This leaves only Alston's section 1983 retaliation claims against certain Town officials (Nancy Daly, Sandra DeBow, Betsy DeWitt, Ben Franco, Kenneth Goldstein, Bernard Greene, Nancy Heller, Joslin Murphy, and Neil Wishinsky) in both their individual and official capacities. With respect to these claims, the Town officials rely heavily on the district court's decision to consider only facts arising after the state-court judgment. Because the district court's temporal limitation was in error, see supra Part

---

[10] Alston also brought a claim against these defendants for conspiracy to deprive him of the equal protection of the laws. See 42 U.S.C. § 1985. The district court entered summary judgment against Alston on this claim. Alston, 2020 WL 1649915, at *5. In his appellate briefing, Alston makes no substantive reference to that ruling. Consequently, we deem any claim of error waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[T]he settled appellate rule [is] that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). It follows that only his section 1983 retaliation claims remain for our review.

II(A), the wind has been taken out of the sails of many of the Town officials' arguments. We consider what remains of their asseverational array.[11]

The Town officials primarily argue that Alston has failed to raise a genuine issue of material fact as to any of the elements of his section 1983 First Amendment retaliation claims. See Lewis, 321 F.3d at 218. They first argue that Alston has not spoken on an issue of public concern. See id. Specifically, they assert that after the state-court judgment, Alston was on sick leave, pending psychiatric clearance. In their view, Alston's grievances from and after that time focused on the outcome of the prior litigation — not a matter of public concern.

This is little more than gaslighting. The Town officials concede that Alston previously protested racial discrimination. Relatedly, they concede that the right to protest discrimination is "inherently" a matter of public concern. See Connick v. Myers, 461 U.S. 138, 148 n.8 (1983). It follows inexorably that once the district court's erroneous temporal limitation has been corrected, Alston's speech satisfies the "public concern" element of his section 1983 retaliation claims.

---

[11] The individual defendants raise several arguments that are duplicative of those raised by the Town and the Board, including arguments in support of affording claim-preclusive effect to the state-court judgment and arguments in support of excluding the D&F from the summary judgment record. For the reasons discussed above, see supra Part II(A), we find those arguments unpersuasive.

- 50 -

Next, the Town officials contend that Alston's interest in his speech was outweighed by the Town's interests in the efficient performance of its public services. See Lewis, 321 F.3d at 218. This contention, too, rests on a mischaracterization of Alston's speech as speech "about previously litigated and adjudged claims." As we have pointed out, Alston's speech can fairly be found to be speech against racial discrimination; so the question for us is whether Alston's interest in speaking against racial discrimination in the Department is outweighed by the Town's interests in the efficient discharge of public services.

In balancing these interests, we are committed to the proposition that "[s]o long as employees are speaking as citizens on matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." Garcetti v. Ceballos, 547 U.S. 410, 419 (2006). Such balancing "requires a hard look at the facts of the case, including the nature of the employment and the context in which the employee spoke." Decotiis v. Whittemore, 635 F.3d 22, 35 (1st Cir. 2011) (quoting Davignon, 524 F.3d at 104). We proceed to take that "hard look," viewing the facts (as the summary judgment standard demands) in the light most favorable to Alston. See O'Connor v. Steeves, 994 F.2d 905, 917 (1st Cir. 1993).

After Alston first became concerned about racial discrimination in the Department, he spoke behind closed doors

with senior firefighters. He then spoke directly with his supervisors. After Pender was promoted, Alston continued to voice his objections to the defendants' allegedly discriminatory conduct. It was only after Alston reasonably perceived that the Department had fumbled the ball that he began to speak more publicly (with other firefighters and with outside parties). Alston's quiet contacts with his supervisors adequately evinces that reporting discrimination in the Department does not per se disrupt the Department's delivery of its important public services. Given these facts, it strains credulity to insist that muzzling employees who wish to speak out against race discrimination is essential for the efficient operation of the Department. See Garcetti, 547 U.S. at 418-19. It follows that Alston has satisfied the second element of his section 1983 retaliation claims.

As to the third and last element, four of the Town officials — DeBow, Murphy, DeWitt, and Goldstein — argue that they did not engage in conduct that can be said to constitute an adverse employment action under section 1983. See Lewis, 321 F.3d at 218. "[T]he 'adverse employment action' inquiry in the section 1983 context focuses on whether an employer's acts, viewed objectively, place substantial pressure on the employee's political views." Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011) (quoting Bergeron v. Cabral, 560 F.3d 1, 8 (1st Cir. 2009)). In undertaking this

tamisage, we look to "whether the defendants' acts would have a chilling effect on the employee's exercise of First Amendment rights." Id. As such, the "pertinent question" is whether the actions of these four defendants comprise the kind of actions that "would deter 'a reasonably hardy individual[]' from exercising his constitutional rights." Id. (quoting Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc)).

Alston contends that these four defendants are liable because they "allowed Alston's pay to terminate in 2014." But Alston elsewhere asserts that his pay ended in October of 2014 because "he had exhausted all of his available leave." In this respect, Alston is hoist by his own petard — especially since the record contains no facts sufficient to cast doubt upon his "exhaustion" assertion. Nor does anything in the record suggest that one or more of these four defendants had the slightest effect on the cessation of Alston's paid leave. Because Alston has failed to provide any factual plinth for a finding that DeBow, Murphy, DeWitt, or Goldstein engaged in an adverse employment action within the purview of section 1983, we affirm the district court's entry of summary judgment in favor of these four defendants, in both their official and individual capacities, on the section 1983 retaliation claims.

The remaining Town officials (Daly, Franco, Greene, Heller, and Wishinsky) argue that, although their firing of Alston

constitutes an adverse employment action, they did not vote to cashier him in retaliation for his protected speech.  See Lewis, 321 F.3d at 218.  In support, they insist that the real reason for Alston's firing was his unfitness for duty.  But as we already have indicated, the record discloses a genuine issue of material fact as to whether that proffered reason for Alston's firing was pretextual.  See supra Part II(B)(2).  As a result, summary judgment cannot rest on this ground.

Alternatively, the remaining Town officials submit that they are entitled to qualified immunity with respect to Alston's individual-capacity claims.  To determine if a public official is entitled to qualified immunity, an inquiring court engages in a "two-step pavane."  Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017).  At the first step, the court must determine "whether the plaintiff's version of the facts makes out a violation of a protected right."  Id.  At the second step, the court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Id. (quoting Matalon v. Hynnes, 806 F.3d 627, 633 (1st Cir. 2015)).  Because qualified immunity is an affirmative defense to liability, the burden is on the defendants to prove the existence of circumstances sufficient to bring the defense into play.  See DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 35 (1st Cir. 2001).

Here, however, we must address the qualified immunity issue within the limits of the arguments presented to us on appeal. In their appellate argument, the remaining Town officials (Daly, Greene, Heller, Franco, and Wishinsky) do not clearly separate out either the first prong of the inquiry or the various components of the second prong. Nor do they attempt to analyze either prong with respect to each defendant (individually). Instead, they argue generally that they did not violate Alston's First Amendment rights without pausing to distinguish between and delineate the two prongs.

Given this superficial presentation, we cannot at this juncture conclude that the remaining Town officials are entitled to qualified immunity. The limitations of the record and of the defendants' arguments stand in the way. It follows that we must vacate the district court's entry of summary judgment on the claims against the remaining Town officials.

We add a coda. To the extent the remaining Town officials focus on the first prong of qualified immunity in their appellate brief, that reliance is mislaid. They have made, at most, generalized and non-specific arguments with respect to each individual defendant. Since we already have held that Alston has survived summary judgment on the merits of his First Amendment retaliation claims, see supra Part II(C), such arguments are insufficient to ground a conclusion that Alston's version of the

- 55 -

facts falls short of working a violation of his constitutional rights.  See Alfano, 847 F.3d at 75.

        We also think it useful to comment upon the second prong of the qualified immunity inquiry.  In their appellate brief, the Town officials cite that prong and state that "the law must have been sufficiently clear that 'any reasonable official in the defendant's position would have known that the challenged conduct is illegal "in the particular circumstances that he or she faced."'"  They also discuss the Pickering balancing of the interests, see Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568 (1968), and their claimed justifications for the termination of Alston's employment.  But they do not explain why these elements of Alston's First Amendment retaliation claims fail one or more components of the second prong.  Given the lack of clarity as to the arguments actually being made, we cannot now conclude that the remaining Town officials are entitled to qualified immunity.  The entry of summary judgment in their favor on Alston's section 1983 free-speech retaliation claims, in both their individual and official capacities, must, therefore, be vacated.

        This does not mean, of course, that the district court cannot explore the qualified immunity issue in all its aspects on remand.  For instance, the district court may entertain successive motions for summary judgment, see FDIC v. Kooyomjian, 220 F.3d 10,

16 (1st Cir. 2000), or address the issue at a subsequent stage of the litigation, see Guzmán-Rivera v. Rivera-Cruz, 98 F.3d 664, 669 (1st Cir. 1996) (noting that even though defendants had waived defense of qualified immunity at summary judgment stage, defense remained available for subsequent stage of litigation). We leave these matters to the district court's informed discretion, and we take no view of the future disposition of the issue.

## D. **Non-Cooperation Agreements**.

There is one loose end. After Alston commenced this action, the Town entered into settlement agreements with three black men who had asserted claims against it.[12] Each of the agreements contained a similarly worded non-cooperation clause, which barred the claimant from "voluntarily cooperat[ing] or assist[ing] any person or entity . . . in the prosecution of any claims against the defendants." One of the agreements went so far as to prohibit cooperation with "Gerald Alston in connection with the pending federal court complaint." The prohibition contained in the agreements, however, was not absolute: the agreements did not prohibit the claimants "from testifying truthfully under oath

---

[12] Alston's first amended complaint (FAC) added seven plaintiffs to this action, but the district court severed the added plaintiffs. Although the added plaintiffs are not parties to this appeal, it should be noted that two of the black men with whom the Town settled were named as plaintiffs in the FAC. The Town also settled with another black man who sought to sue separately for assault and battery.

if compelled to do so via subpoena or court order in a legal proceeding" or from "cooperating with any federal or state agency investigation not initiated by a Party."

When Alston learned of the agreements, he moved for an order voiding the clauses prohibiting voluntary cooperation with a party in his position as against public policy. The district court denied the motion, and Alston assigns error.

Alston's principal plaint is that the non-cooperation clauses are against public policy. In support, he relies primarily on our decision in EEOC v. Astra USA, Inc., 94 F.3d 738 (1st Cir. 1996). There, we concluded that agreements that prohibit cooperation with government agencies are void on public policy grounds. See id. at 745. This case, however, is a horse of a different hue: the clauses at issue explicitly allow the signatories to cooperate with agency investigations and to provide information pursuant to subpoenas or court orders. Astra is, therefore, inapposite.

In a final attack on these agreements, Alston argues that, in pursuing his civil rights claims, he is acting as a private attorney general. As a result, he suggests, his claims "implicate[] the public interest in safeguarding civil rights." Alston's reasoning is flawed. It would essentially ban commonplace non-disclosure clauses from settlement agreements in all civil rights actions. Such a broad proscription finds no support in the

case law.  To the contrary, "public policy strongly favors encouraging voluntary settlement of employment discrimination claims."  Id. at 744.

We will "rarely" invalidate settlement agreements on public policy grounds.  Bandera v. City of Quincy, 344 F.3d 47, 52 (1st Cir. 2003).  This case falls within the general rule, not within the long-odds exception to it.  The Town's use of non-cooperation clauses as a bargaining chip in settlement negotiations may be controversial, but we are not prepared to break new ground and hold that a municipality's use of such clauses is against public policy.  We therefore affirm the district court's denial of Alston's motion to void the non-cooperation clauses.

III. CONCLUSION

We need go no further.  Just as large oaks from single acorns grow, so too — as this case illustrates — sprawling lawsuits can grow from a single, highly charged racial slur.  And this suit is not yet at an end.  For the reasons elucidated above, the judgment of the district court is affirmed in part and vacated in part.  Specifically, we vacate the district court's grant of summary judgment as to Alston's retaliation claims under section 1983 against the Town and the Board.  We also vacate the district court's judgment as to Alston's section 1983 retaliation claims against Daly, Greene, Heller, Franco, and Wishinsky, in their personal and official capacities.  The case is remanded for further

proceedings consistent with this opinion.  All parties shall bear their own costs.

**So Ordered**.